Nancy PATTON, Jess Edward Patton III,
and Gary Allen Patton, Respondents-
Appellants,

v.

R. J. PATTON and R. F. Boyd, d/b/a Pat-
ton & Boyd, and Iowa National Mutual
Insurance Company, Respondents,
and
Tri-State Warehousing and Distributing
Company, and Casualty Reciprocal
Exchange, Appellants.

No. 45978.

Supreme Court of Missouri,
Division No. 2.

Jan. 13, 1958.

Roy Coyne, Max Patten, Joplin, for appellants Nancy Patton, Jess Edward Patton, III, and Gary Allen Patton.

Herbert Van Fleet, Joplin, Douglas Stripp, Vincent E. Rawson, Kansas City, for appellants Tri-State Warehousing & Distributing Co. and Casualty Reciprocal Exchange. Seiler, Blanchard & Van Fleet, Joplin, Watson, Ess, Marshall & Enggas, Kansas City, of counsel.

McReynolds, Flanigan & Flanigan, Laurence H. Flanigan, Carthage, for respondents.

BOHLING, Commissioner.

This is a workmen's compensation case. Claimants, the widow and two infant sons, one by a prior marriage, recovered an award of $12,000 for the death of Jess Edward Patton, Jr. (referred to hereinafter as Jess Patton), and $400 burial expense, against Tri-State Warehousing and Distributing Company, a corporation (referred to hereinafter as Tri-State), and Casualty Reciprocal Exchange, its insurer, as the special employer of said Patton. The award exonerated R. J. Patton and R. F. Boyd, a partnership doing business as Patton & Boyd, and Iowa National Mutual Ins. Co., their insurer, as the general employer of said Patton. Tri-State appealed from the award against it and the claimants have appealed from that portion of the award exonerating Patton & Boyd. The Circuit Court affirmed the award, and Tri-State and the claimants have again appealed.

 The main contentions of the defendants are that Jess Patton's death did not arise out of and in the course of his employment and is not compensable, and each contends if his death is compensable the other is liable under the Workmen's Compensation Law.

Jess Patton was self-employed for a while as a driver and owner of a tractor-trailer unit which he leased to and operated for Tri-State. About three months prior to his death he sold his unit, went to work for Patton & Boyd and drove a Patton & Boyd unit under lease to Tri-State. R. J. Patton of Patton & Boyd was his brother. Jess Patton was found dead at Larned, Kan., on the morning of November 22, 1953, while en route as a driver of a Patton & Boyd unit under lease to Tri-State hauling a shipment of explosives from Mead, Neb., to Gallup, N. M., for Tri-State.

Patton & Boyd and Tri-State operated under the Missouri Workmen's Compensation Law and the liability of each is fully insured. It was stipulated that Jess Patton's death was the result of asphyxiation caused by a defective gas stove in a motel and was an accident.

Patton & Boyd and Tri-State are located in Joplin, Mo. Patton & Boyd carried some freight as an interstate private carrier, having an interstate permit therefor, but had no interstate common carrier permit or permit to carry explosives interstate, and did not operate under the Interstate Commerce Commission regulations. Tri-State is primarily an interstate long-haul common carrier of freight, a large portion of its business being the transportation of dangerous articles. Tri-State was engaged in transporting explosives for the Defense Department of the United States Govern-

ment from Mead, Neb., to Gallup, N. M., having approximately 70 drivers and 100 units engaged in this work. About nine or ten drivers were employees of and operated equipment owned by it. Other drivers and units were furnished under contracts of lease between different carriers and Tri-State. Patton & Boyd thus furnished eight to twelve units to Tri-State.

The lease of "Unit No. 2423," the unit operated by Jess Patton on the occasion in question, was negotiated and executed in Joplin, Mo., on October 1, 1953, between Patton & Boyd, lessor, and Tri-State, lessee. The more pertinent provisions here involved are:

"4. It is understood that the leased equipment under this agreement is in exclusive possession, control, and use of the authorized carrier Lessee and that the Lessee assumes full responsibility in respect to the equipment it is operating."

Paragraph 5 of the lease stated that the lessee, before taking possession of the equipment, had the equipment inspected by responsible and competent employees of the lessee, and that the equipment complied with certain specified regulations pertaining to the transportation of explosives or other dangerous articles.

Paragraph 7 provided: "For and in consideration of the leasing of the equipment (and the services of the driver of said equipment) used, the Lessee agrees to pay the Lessor" for the transportation here involved at the rate of seventeen cents per deadhead mile and thirty-one and one-half cents per loaded mile.

Paragraph 9 read: "The Lessor agrees: (a) to deliver to the Lessee the herein described equipment in good running order and condition; maintain at his expense the same in good working condition in order to meet the Lessee's requirements on equipment; (b) to furnish all necessary oil, gasoline, tires and repairs for the operation of said equipment and to pay all other expenses incident to such operation; (c) to carry at his expense adequate fire, theft, and accident insurance, protecting himself from loss and damage; (d) to drive himself or to furnish at his expense a competent and qualified (subject to Lessee's approval) employee; (e) to carry Workmen's Compensation Insurance, covering himself or said driver and to protect and indemnify Lessee against any loss resulting from injury or death of himself or said driver and from loss or damage resulting from incompetency or dishonesty upon the part of himself or said driver; (f) to pay all welfare benefits and social security and unemployment taxes and to withhold all taxes as required by the U. S. Government; (g) to comply with all laws, rules, and regulations governing the operation of motor vehicles over the highway and that he will pay all fines and penalties due to lack of proper tags and plates, overloads, speeding or traffic violation; and rules by the various Municipal, State and Federal regulatory Bodies having jurisdiction; (h) to receive and put into effect instructions issued by the Lessee regarding points of origin and destination, safety measures, routes, rest stops, loading, unloading, cargo protections, and any other specific instructions, regarding operating procedure or methods; (i) to allow the Lessee to interline the described trailer with other qualified and competent Common Carriers."

As required by the lease, operators of leased equipment had to be approved by Tri-State. Jess Patton was an approved operator.

On November 18, 1953, the Tri-State office at Joplin telephoned Patton & Boyd to make available at Mead, Neb., a unit for transporting ammunition and explosives to Gallup, N. M. There was testimony that Tri-State would call for a particular driver because he had been previously approved and on this occasion called for Jess Patton and the unit of equipment operated by him. Patton & Boyd had Jess Patton proceed to Mead.

Tri-State was required to conduct shipments of explosives under regulations of

the Interstate Commerce Commission and the Department of Defense of the United States Government. These regulations required drivers to have with them a doctor's certificate, issued within six months, that they were physically fit; required drivers to stop at all railroad crossings; to stop every 50 miles and check the tires; to operate their units a mile apart; to not work over 70 hours in any 192-hour period; and to run only approximately 350 miles in a 10-hour period. Drivers were not permitted to leave a loaded unit unattended at any time. The unit was not permitted to leave a rest stop for a 10-hour period. The driver was not permitted to sleep in the unit. He was required to leave, and required to take a minimum of eight hours' rest.

Tri-State designated in detail the route to be followed, Larned, Kan., and Tucumcari, N. M., as the "rest stops" on the haul involved, selected the place to park the units at the stops, and arranged for guards to be on duty while any unit was parked at such stops. The motel where Jess Patton stayed the night of his death was within walking distance of where the units had been parked and was used by drivers hauling explosives for Tri-State.

The testimony of Tri-State's witnesses was to the effect that all drivers, Tri-State and drivers of leased units, were subject to Tri-State's supervision while actually hauling the explosives, but that it had nothing to do with what the driver of a leased unit did after he signed out at a rest stop. Prior to loading Tri-State would inspect the equipment and check the driver. If the equipment were defective or the driver failed to meet requirements, the unit was not permitted to proceed and the lessor was notified so that he could make the necessary replacements. If a driver of a leased unit became incapacitated or violated regulations en route, Tri-State would "hold him up right there," and would notify the lessor to furnish another driver, but had no right to discharge a driver from Patton & Boyd's service.

Lessors of leased units had no authority to interfere with the regulations or instructions of Tri-State. They could only cease operating under the lease if not satisfied.

Tri-State paid the expenses of their own drivers while on the road and designated where they stayed and what they were to do. It did not pay the expenses of drivers of leased units or designate where they were to stay. However, when authorized by the lessor (they were so authorized by Patton & Boyd), Tri-State advanced money to the drivers of leased units, its general manager testifying the advancements were to pay truck equipment expenses from point of origin to destination but were not for the drivers' personal expenses on the haul. The manifest issued for the haul involved showed Tri-State advanced Jess Patton $200. Patton & Boyd paid Jess Patton 25% of the gross pay of a haul for his services, but had no arrangements with and made no advancements to him covering his personal expenses, and did not tell him where to stay while on the road. Tri-State's Joplin office, upon receipt of the manifest after a haul, deducted any advancements to the driver of a leased unit and remitted the balance to the lessor. Upon receipt of this remittance, Patton & Boyd settled with its drivers, including Jess Patton, who would produce his "tickets" covering his expenses.

Tri-State and Patton & Boyd contend the accident causing Jess Patton's death did not arise "out of and in the course of his employment." §§ 287.120, subd. 1, 287.020, subd. 5. Statutory references are to RSMo 1949, V.A.M.S. The argument is that Jess Patton's responsibility for the unit he operated and all control over him ceased when he signed out at the parking place at Larned, Kan., and was not to be resumed until the next morning, he being free to select his own lodging at his own expense.

Jess Patton was not a plant worker rendering service confined to a fixed location provided by the employer. His service did not begin when he went to work on his employer's premises and end when he quit

for the day. The discharge of his duties as driver of a unit transporting explosives interstate required his presence at places along the route and securing needed rest at night. His responsibilities continued after he parked his unit at Larned. So far as disclosed of record he retained the keys to his unit. This case does not involve a deviation from his employment by an employee. If the expense incurred was not advanced by Tri-State or Patton & Boyd, it was included in the 25% of the gross revenue he was to receive for his services. His death was due to a hazard to which he would not have been exposed apart from his employment. The securing of eight hours' rest was the minimum required by the Interstate Commerce Commission regulations and was an incident to his employment as driver of his unit. § 287.020, subd. 5; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S.W.2d 601, 605 [7, 8], following Wahlig v. Krenning-Schlapp Grocer Co., 325 Mo. 677, 29 S.W.2d 128, 130 [1–4]. McClellan v. Neptune Storage, 264 App.Div. 800, 34 N.Y.S.2d 745, affirmed an award of compensation for the death of a truck driver from asphyxiation after he retired for the night at a tourist cabin while engaged in a long haul for his employer. Lasear, Inc., v. Anderson, 99 Ind.App. 428, 192 N.E. 762, 765 [8, 9], is to like effect. Truck drivers and traveling salesmen are traveling employees. See, with respect to traveling salesmen, California Cas. Ind. Exch. v. Industrial Accident Comm., 5 Cal. 2d 185, 53 P.2d 758; Texas Employers Ins. Ass'n v. Cobb, Tex.Civ.App., 118 S.W.2d 375, 379 [4–6]; and cases cited 1 Larson, Workmen's Compensation Law, 384, § 25.00.

Jess Patton was not an independent contractor. He was in Larned as an employee. We conclude his death was "by accident arising out of and in the course of his employment," and that he was an employee of Tri-State or of Patton & Boyd or, perhaps, of both.

The Missouri cases cited by defendants (Schraner v. Massman Construction Co., Mo.App., 48 S.W.2d 104, and Garbo v. P. M. Bruner Granitoid Co., Mo.App., 249 S. W.2d 477) are readily distinguishable from the instant case. In each the Commission's denial of compensation was affirmed by the appellate court, the employee was hired to work at a fixed location, and the injury did not occur on the employer's premises, but while the employee was engaged on a mission of his own. Defendants' case of Kass v. Hirschberg, Schutz & Co., 191 App. Div. 300, 181 N.Y.S. 35, 37 [2, 3] is not in harmony with McClellan v. Neptune Storage, supra; In re Buck's Estate, 277 App. Div. 126, 98 N.Y.S.2d 734, and Blake v. Grand Union Co., 277 App.Div. 914, 98 N. Y.S.2d 738, later cases reaching a different result without citing the Kass case; and in each the New York Court of Appeals denied motions for leave to appeal, 289 N.Y. 853, 44 N.E.2d 423, and 301 N.Y. 813, 95 N.E.2d 57. Wallace v. Texas Indemnity Ins. Co., Tex.Civ.App., 94 S.W.2d 1201, is also distinguishable on the facts.

The instant death occurred in Kansas, and Tri-State contends the contract of employment between it and deceased, if any, was made in Nebraska and the Missouri law is not applicable to any employment by it of deceased. The Missouri law applies, so far as pertinent here, "to all injuries received in this state * * *, and also to all injuries received outside of this state under contract of employment made in this state * * *." § 287.110, subd. 2.

Tri-State argues that it did not approve Jess Patton as driver under ¶ 9d, supra of the lease until he was checked at Mead, Neb., and it there first indicated the route, the rest stops to be made, the other regulations for hauling the explosives, and issued its manifest to him for the haul. The contention is based on observations reading: "It is settled law that the place where the final act occurs which makes a binding contract is the place of contract." Deister v. Thompson, 352 Mo. 871, 180 S.W.2d 15, 17 [2]; Rendleman v. East Texas Motor Freight Lines, 355 Mo. 287, 196 S.W.2d 171, 174 [6].

The lease here involved and offered in evidence covered "Unit No. 2423," a tractor. The testimony was that so far as material the leases covering trailers were identical with those covering tractors. The instant lease was negotiated and executed in Jasper County, Mo., where the parties and Jess Patton lived. The parties must have intended to contract in Missouri for performance outside of the State. The lease recited that "Unit No. 2423," was in the "exclusive possession, control and use" of the lessee, and had been inspected by lessee and found to comply with certain motor carrier safety regulations, including regulations for the safe transportation of explosives. The lease did not authorize Tri-State to disapprove a competent and qualified driver.

There is evidence of record warranting findings to the following effect: Jess Patton had driven his own unit under a lease with Tri-State, and had been working for Patton & Boyd for three months prior to his death. Unit No. 2423 had been leased to Tri-State under prior leases. At the time involved Unit No. 2423 was under a lease dated October 1, 1953, to be in effect for one year, and was being used exclusively in the service of Tri-State. When a lease was executed Patton & Boyd furnished the name of the driver of the leased unit to Tri-State. Jess Patton was assigned by Patton & Boyd as driver of Unit No. 2423. Tri-State knew he was the driver of said unit and that he had been operating said unit under said lease. On November 18, 1953, the Joplin office of Tri-State notified Patton & Boyd to send "Unit No. 2423" and Jess Patton, by name, as driver, to Mead. Jess Patton was a driver approved by Tri-State and its doctor and Patton & Boyd would have had to secure Tri-State's "O.K." to furnish a different driver. The "deadhead" rate applied to the trip from Joplin to Mead, and was included in the payment made by Tri-State to Patton & Boyd. When Jess Patton left Joplin for Mead he entered upon his service to Tri-State under the lease. This was sufficient competent evidence to sustain a finding that the parties intended to contract and that their minds met in Missouri and that Jess Patton's services were under a Missouri contract. Johnson v. Great Lakes Pipe Line Co., 358 Mo. 445, 215 S.W.2d 460, 463 [1, 4]; Thacker v. Massman Const. Co., Mo., 247 S.W.2d 623, 629, 630; Muse v. E. A. Whitney & Son, 227 Mo.App. 640, 56 S.W. 2d 848, 849 [1]; 17 C.J.S. Contracts § 356, p. 813.

Tri-State contends the court erred in affirming the award against it for the reason Patton & Boyd did not resign *full* control of Jess Patton for the time being and Tri-State did not have sole and exclusive control over him, and, also, the employee did not consent to a change of employers. Many authorities on this issue are reviewed in the briefs.

In O'Brien v. Rindskopf, 334 Mo. 1233, 70 S.W.2d 1085, a frequently cited tort action, the borrowing or special employer of a truck and driver of the general employer merely ascertained that the driver was on hand, knew the route to be taken, and directed him to remove flowers to be taken to a cemetery after a funeral through a side door. On the way to the cemetery the driver negligently collided with an automobile in which plaintiff was a guest and injured her. In holding, after a review of authorities, the only allowable inference was that the driver remained the servant of the general employer (70 S.W.2d 1091 [5, 6]), we said (70 S.W.2d 1088 [3, 4]):

"The question of who is the master and therefore responsible for the negligent act of the servant is said to be determinable by who at the time has the right to control the acts of the servant causing the injury. The right of control, rather than the fact of control, governs. * * *" And, quoting 39 C.J. 1274, § 1462: "'* * * To escape liability the original master must resign full control of the servant for the time being * * *'" See also 57 C.J.S. Master and Servant § 566.

Additional cited tort actions to like effect are: State ex rel. Chapman v. Shain,

347 Mo. 308, 147 S.W.2d 457, 461 [3, 4]; Wills v. Belger, 357 Mo. 1177, 212 S.W.2d 736, 739 [2–4, 7]; Boroughf v. Schmidt, Mo.App., 259 S.W. 881, 883.

Schepp v. Mid City Trucking Co., Mo. App., 291 S.W.2d 633, stressed by Tri-State, was a compensation case in which an award was entered against Mid City Trucking Company, the general employer, referred to as Mid City, and Pacific Intermountain Express, the special employer, referred to as PIE. The Court of Appeals sustained the award against Mid City and discharged PIE. The Schepp case stressed (291 S.W.2d 639 et seq.) the Wills case, supra, a tort action in which the material facts were very similar to those in the Schepp case. In the Schepp case, PIE had arrangements with Mid City to lease a tractor and driver at $4.25 an hour to handle local deliveries and pick-ups in connection with its interstate common carrier business when there was an "overflow" of such business for PIE drivers. PIE had to call Mid City each day it needed a tractor and driver. Mid City drivers always reported to Mid City at the beginning and close of each work day, and as soon as completing the work assigned them by PIE. The instructions given to such drivers by PIE were " 'confined entirely to the accomplishment of the purpose of completing the delivery of freight, or the bringing of freight' to PIE's terminal". In holding the right of control surrendered by Mid City to PIE was insufficient to sustain the award against PIE, the court said (291 S.W.2d 640 [3]):

"Control, or lack of control, of the employee, while of 'greatest significance', is not conclusive. * * * In any event the 'control' must be authoritative direction and control, not mere suggestions as to details or necessary cooperation. * * * The mere fact that the general employer permits some division of control does not give rise to the inference that he has surrendered control. * * * Surrender of partial control in a third person does not relieve the general employer. * * * The general employer must release full and complete control. * * *"

Additional cited compensation cases sustaining awards against the general or original employer are: Stroud v. Zuzich, Mo., 271 S.W.2d 549, 555; Evans v. Farmers Mut. Hail Ins. Co., 240 Mo.App. 748, 217 S.W.2d 705, 709; Hargis v. United Transports, Inc., Mo.App., 274 S.W.2d 339, 344; Boehck Equipment Co. v. Industrial Comm., 246 Wis. 178, 16 N.W.2d 298, 300 [1]; Turner v. Schumacher Motor Express, Inc., 230 Minn. 172, 41 N.W.2d 182, 184 [3]; Gibson v. Moore Freight Lines, Inc., 246 Minn. 359, 75 N.W.2d 212, 216.

Cases holding that there was substantial evidence to sustain a verdict or an award of compensation against the general employer, as in some of Tri-State's citations, are not determinative here. In other cases this fact issue has resulted in holding the borrowed servant with respect to the particular act was the servant of the special employer. Tri-State would apply the rule that the general employer must resign full control and the special employer must have sole and exclusive control too broadly.

In McFarland v. Dixie Machinery & Eq. Co., 348 Mo. 341, 153 S.W.2d 67, 136 A.L.R. 516, Kansas City, Mo., was required to furnish certain machinery to Works Progress Administration, which had complete supervision of certain river improvement work, including labor. The city borrowed a heavy tractor, costing $4,800, and operator from defendant, paying $50 a day, and furnished it to WPA. Defendant was to supply all grease, oil and fuel, keep the tractor in repair, furnishing a service man therefor whenever necessary, and pay the operator, who could be discharged only by defendant. The operator was told to do whatever those in charge wanted him to do outside of jeopardizing the machinery. If dissatisfied with his work WPA would ask for another operator. The operator was experienced and no one undertook to tell him how to operate the tractor, but WPA would tell him when, where and what

kind of work to do. Plaintiff was injured while the operator was complying with directions given him by WPA. The court held plaintiff failed to establish a master and servant relationship between the operator and his general employer for the application of the respondeat superior rule as to the work in which plaintiff was injured, and reversed a judgment for plaintiff. The court reviewed authorities and applied the following from the Restatement of Agency, 501, § 227 (153 S.W.2d loc. cit. 71, 72):

" 'Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting *in the business of and under the direction of* one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed *in the business of and subject to the direction of* the temporary employer as to the details of such act. This is a question of fact in each case.' (Our italics.)"

Our Workmen's Compensation Law, so far as material, defines "employer" as: "Every person, partnership, * * *, corporation * * * using the service of another for pay" (§ 287.030, subd. 1); and "employee" as: " * * * every person in the service of any employer, as defined in this chapter, under any contract of hire, expressed or implied, oral or written, or under any appointment or election" (§ 287.-020, subd. 1).

This law has been considered a workmen's compensation law rather than an employees' compensation act. Pruitt v. Harker, 328 Mo. 1200, 43 S.W.2d 769, 772; Laws 1925, p. 375, Title; § 287.010. Under § 287.800 it is to receive a liberal construction as to the rights of employees. Spradling v. International Shoe Co., 364 Mo.

938, 270 S.W.2d 28 [1]. We have said: "The questions of who is an employer and who is an employee, under compensation acts, do not usually depend upon common-law principles (although they may be considered in their construction) but depend instead upon the terms and definitions of such Acts." Loudenslager v. Gorum, 355 Mo. 181, 195 S.W.2d 498, 500 [3]. The master's liability thereunder is not for a tort based on the rule of respondeat superior. The compensation law is broader than the common-law principles of master and servant.

Pruitt v. Harker, supra, 43 S.W.2d loc. cit. 772 [2, 3], upheld a compensation award against a landowner who contracted separately with different persons to operate sawmills. The landowner merely furnished the timber and the sawmill and paid the operators according to output. Each operator hired and paid his own help and all expenses. Claimant, a minor, was working for his father and was held to be an employee within the act, though he drew no wages and performed his service under no contract, express or implied. The court stated the definition of "employee," quoted above, was "given a broad meaning and includes every person 'in the service of any employer' and is not confined to those 'under any contract of hire,' express or implied, but also includes those performing service by 'appointment or election.' "

In Ellegood v. Brashear Freight Lines, 236 Mo.App. 971, 162 S.W.2d 628, Harold Curtis furnished a truck and plaintiff as driver to defendant for a consideration. Plaintiff operated out of Brashear's place of business, got gas and oil at and received all his instructions from Brashear. He saw Curtis once a week to collect his pay. In reversing plaintiff's judgment and holding plaintiff's rights against Brashear were under the compensation act (162 S.W.2d loc. cit. 634) the court stated the only contract of service shown was that between plaintiff and his general employer Curtis, but ruled plaintiff was a statutory employee of Brashear by appointment under § 287.-

020, subd. 1 (Id., 162 S.W.2d loc. cit. 631, 632), applying Pruitt v. Harker, supra; and, upon further review of authorities, that plaintiff also was an employee of Brashear under the common law rule (Id., 162 S.W.2d loc. cit. 633, 634).

It has been said that "the fact of control standing alone is not conclusive." Coy v. Sears, Roebuck & Co., 363 Mo. 810, 253 S.W.2d 816, 818 [1]; the Schepp case, supra. It is the "right of control" (the Coy case, supra), or perhaps more clearly expressed the "right to direct" (the McFarland case, supra, 153 S.W.2d loc. cit. 71) and not the exercise of that right which is the factor for consideration on the control issue.

See also, among others, Gorman v. A. R. Jackson Kansas City Showcase Works Co., Mo.App., 19 S.W.2d 559, 563; Clayton v. Wells, 324 Mo. 1176, 26 S.W.2d 969, 972 [3, 4], and cases cited; Pruitt v. Industrial Acc. Comm., 189 Cal. 459, 209 P. 31, 33; Wall v. Penn Lumber & Mill Works, 171 Pa.Super. 512, 90 A.2d 273 [1]; Texas Recip. Ins. Ass'n v. Latham, Tex.Civ.App., 72 S.W.2d 648 [2]; Oklahoma Gen. Power Co. v. State Industrial Comm., 108 Okl. 251, 235 P. 1095 [1]; Seaman Body Corp. v. Industrial Comm., 204 Wis. 157, 235 N.W. 433, 435 [1]; Annotations, 152 A.L.R. 824; 58 A.L.R. 1468; 34 A.L.R. 770; 3 A.L.R. 1182; 57 C.J.S. Master and Servant § 566, p. 284.

■ That the general employer retains the right to discharge, pays the wages, keeps the machinery in repair, meets the expenses of its operation, and other factors do not prevent the employee from becoming the employee of the special employer. McFarland, Ellegood, Gorman, and other cases, supra.

Tri-State stresses ¶ 9, quoted supra, of the lease as establishing control in Patton & Boyd. As stated in McFarland v. Dixie Machinery & Eq. Co., supra, since the question of liability arises because of some specific act, the important question is not whether the servant remains the servant of the general employer as to matters generally, but whether, as to the act in question, he is acting in the business of and under the direction of the general or special employer. The act here involved was not connected with, for instance, the maintenance of the leased equipment (¶ 9, a), the furnishing of oil, gasoline, tires or repairs (¶ 9, b), the violation of any law, rule, or regulation (¶ 9, g) or other subdivisions of said ¶ 9. The instructions to be put in effect under ¶ 9, h, were Tri-State's instructions; and the situation was as if Patton & Boyd had instructed its drivers to do whatever Tri-State wanted done outside of jeopardizing the equipment as in the McFarland case, supra, or had merely turned the driver over to Tri-State to follow Tri-State's instructions as in the Ellegood case, supra.

The hauling of the explosives was under regulations of the Interstate Commerce Commission and the Department of Defense. Patton & Boyd had no authority to transport explosives in interstate commerce, their equipment could be used therein only as one of the units of Tri-State, and it would appear to follow that a driver of a Patton & Boyd unit would operate as an employee of Tri-State while hauling the explosives involved. Brown v. L. H. Bottoms Truck Lines, 227 N.C. 299, 42 S.E.2d 71 [7–9].

The Interstate Commerce Commission regulations required drivers to secure a minimum of eight hours' rest at rest stops. The Commission could find on the record made that Tri-State had the right to see that all drivers, not only drivers of Tri-State owned equipment, secured the required eight hours' rest.

■ Jess Patton had worked for Tri-State as an owner-driver of leased equipment, and was subject to Tri-State's control in hauling explosives. During the three months he worked for Patton & Boyd he drove a leased unit of Patton & Boyd for Tri-State. He passed all requirements for a driver of explosives to Tri-State's satisfaction, and was a driver approved by Tri-

**748**

State. This was sufficient evidence to sustain a finding he consented to render service for and obey the directions of Tri-State in hauling the explosives. See the Ellegood case, supra, 162 S.W.2d loc. cit. 631–633; McFarland case, supra, 153 S.W. 2d loc. cit. 71; Pruitt case, supra, 43 S.W. 2d loc. cit. 771; Brown case, supra, 42 S.E. 2d loc. cit. 79.

 Claimants and Tri-State contend error occurred in affirming that portion of the award exonerating Patton & Boyd. Each cites § 287.130; Wigger v. Consumers Cooperative Ass'n, Mo.App., 301 S.W.2d 56, 61 [4], and Larson, Workmen's Compensation Law, § 48.40.

Section 287.130 provides that if the "death occurs while the employee is in the joint service of two or more employers, their liability shall be joint and several, and the employee may hold any or all of such employers. * * *" In the Wigger case, supra, claimant was an employee of Consumers Cooperative Association (referred to as "Consumers"). Consumers purchased farm machinery, etc., from Cockshutt Farm Equipment, Inc. (referred to as "Cockshutt") for resale in nine states. Consumers desired to discontinue its farm implement business. Consumers and Cockshutt entered into a contract to facilitate the liquidation of the machinery and parts Consumers had in stock. The agreement, among other things, provided for the retention of certain employees of Consumers in the joint efforts of the two in the liquidation. Claimant was thereafter injured while repairing machinery under the contract at Consumers' warehouse. In affirming an award against Consumers and Cockshutt, the court ruled "that Consumers and Cockshutt entered upon a joint enterprise or program from which both expected to receive benefits; and they were joint employers of the employees supplied by Consumers." Larson, supra, § 48.40, states: "Joint employment occurs when a single employee, under contracts with two employers, simultaneously performs the work of both under the control of both."

In the instant case Patton & Boyd had no authority to engage in the transportation of the explosives involved as an interstate common carrier, and, aside from other possible factors, the presentation fails to establish the error assigned. Francis v. Sam Miller Motors, Mo., 282 S.W.2d 5 [1]; Harper v. Home Imp. Co., Mo., 235 S.W.2d 558 [1, 2].

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All concur.