**O.B. HUFF, Respondent,**

v.

**BELFORD TRUCKING COMPANY and Missouri Insurance Guaranty Association, Appellants.**

No. WD 42941.

Missouri Court of Appeals, Western District.

March 19, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 1991.

Application to Transfer Denied June 11, 1991.

John R. Fox, Kansas City, for appellant Belford Trucking Co.

James C. Jarrett, Kansas City, for respondent.

Before GAITAN, P.J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

This is a workers' compensation claim. Claimant Huff was a truck driver. He was returning to his home base in Trenton, Missouri, on a trip that had originated in Trenton some days before and which had taken him as far east and south as Tampa, Florida. He had pulled his truck off the road north of Birmingham, Alabama, in order to sleep in his cab. He was shot in the head in an armed robbery and badly injured. The person who shot him was never identified.

Huff was awarded workers' compensation against Tharp Sales and Service Company of Trenton, Missouri, owner of the truck, and against Belford Trucking Company of Ocala, Florida, lessee of the truck, as joint employers of Huff.

Belford Trucking Company has appealed, putting forward two arguments. It says it was not an employer or joint employer of Huff, and says also that Huff is foreclosed from Missouri workers' compensation benefits by Florida's denial of workers' compensation benefits against Belford in an earlier proceeding there.

Claimant in order to succeed against Belford Trucking Company must establish an employment relationship existed between himself and Belford Trucking at the time of the accident. § 287.020(1), RSMo 1986. The pivotal question in determining the existence of the employment relationship is whether the alleged employer had

the right to control the employee's conduct of the work at the time of the accident. *Miller v. Hirschbach Motor Lines, Inc.*, 714 S.W.2d 652, 656 (Mo.App.1986); *Ceradsky v. Mid–America Dairymen, Inc.*, 583 S.W.2d 193, 197 (Mo.App.1979).

Huff was originally—before November, 1978—an employee of Tharp Sales and Service, performing various services, including driving Tharp trucks. Tharp carried on two businesses. One was the sale and transportation of fertilizer and chemicals, custom application of pesticides and herbicides and the erection of grain bins. The other was the leasing of trucks to Belford Trucking, which Belford used in its business of hauling meat, orange juice and packaged foods.

At Tharp's suggestion, Huff in November, 1978, had gone to Ocala, Florida, Belford Trucking Company's main office, and had become qualified to drive Belford trucks. This involved Huff's taking a medical examination, a written examination and an instructional course, including instructions about Belford's log books and procedures. Tharp assigned Unit 752 to Huff, which was leased to Belford. Huff thereafter drove Unit 752 and was driving it when he was shot. The truck had Belford's identifying signs painted on it.

The contract between Tharp Sales and Service, the truck lessor, and Belford Trucking Company, the lessee, provided that Tharp would receive 75 percent of the revenue generated by every load hauled by the leased unit. In general, Tharp Sales and Service paid all expenses connected with the operation and maintenance of the work, including furnishing a driver who was the employee of Tharp Sales and Service. All Huff's paychecks came from Tharp Sales and Service and none ever from Belford. Belford claimed it had the power to fire a driver, such as Huff, although it considered Huff a responsible driver.

Huff took all his directions with reference to the truck from Belford. Normally he hauled loads from Iowa to Florida, and from points in Florida to points in Iowa. When he delivered a load, he would call Belford to get directions for picking up the next load. He would also call Belford during the trip twice each day with such reports as Belford required. It was a refrigerated truck and one report he seems to have made regularly was the temperature of the load. Belford maintained workers' compensation insurance on Huff, and collision and liability insurance on the truck, and cargo insurance; the cost of the insurance was deducted from the rental payments.

After Huff was shot, Tharp sought and received from Belford permission for Wayne Buswell to drive the truck from Alabama back to Trenton.

On the outbound trip before the return trip during which be was shot, Huff had hauled a load of beef from Des Moines, Iowa, to Tampa, Florida. At some time before or while Huff off loaded the beef in Florida, Tharp contacted Belford and asked that Huff be permitted to pick up a load of clay at Attapulgus, Georgia, and haul it to Tharp's at Trenton, Missouri. Belford agreed, although it had loads which Huff could have picked up in Florida to be hauled to Iowa. When Huff called Belford to report he had delivered his cargo of beef at Tampa, he was told to call Tharp. Huff proceeded to call Tharp, who directed Huff to pick up the clay and deliver it to him at Trenton. Huff called Belford for permission to do so and received permission, but was told to get in touch with Belford as soon as he had delivered the load of clay to Tharp at Trenton.

■ For the purpose of analysis, we may logically treat Belford as Huff's general employer. The arrangement between Tharp, the owner and lessor of the truck, and Belford, the lessee, seems to be a common one, wherein the owner of the truck furnishes the driver along with the truck. Such an arrangement was involved in *Reichert v. Jerry Reece, Inc.*, 504 S.W.2d 182 (Mo.App.1973), in which the question was whether the truck driver for workers' compensation purposes was an employee of the lessee of the truck when the driver was injured while doing the work of the lessee—even though for other purposes the

driver would be considered the employee of the lessor of the truck. A decision of the Industrial Commission was affirmed which held that the lessee of the truck was the employer for workers' compensation purposes. *Accord Schepp v. Mid City Trucking Co.,* 291 S.W.2d 633 (Mo.App.1956).

■ Belford's defense, then, may be treated as the "borrowed servant" defense. The core of the "borrowed servant" defense is that the general employer (Belford, in this case) has surrendered to the borrower (Tharp, in this case) all control over the employee, so that the employee has become, with respect to the work for which he was loaned, exclusively the employee of the special employer or borrower. *See, e.g.,* 82 Am.Jur.2d, *Workmen's Compensation* § 410 (1976); *Wittgrove v. Green Lea Dairies,* 223 S.W.2d 114, 116 (Mo.App. 1949). If the general employer retains some control over the employee as he goes about the work for which he has been lent and borrowed, the "borrowed servant" defense to the workers' compensation claim is not available to the general employer. *Id.* For one to be a borrowed servant, he must himself have consented, expressly or impliedly, to leave the employ of the general employer and become, for purposes of the work at hand, the employee of the borrowing employer. *Erwin v. Polar Express, Inc.,* 776 S.W.2d 458, 460–61 (Mo.App. 1989).

We have concluded that the Industrial Commission could find on the basis of the evidence before it that Huff (who was the employee of Belford while engaged in Belford's enterprise, *see Reichert,* 504 S.W.2d at 186–87; *Schepp,* 291 S.W.2d at 640) continued to be the employee of Belford while transporting the cargo of clay from Georgia to Trenton, Missouri, for Tharp, the owner of the truck. Belford, although it did not exercise the right, did not surrender the right to control the details of Huff's work during this trip. The lease of the truck continued during this trip without interruption. The truck was marked with Belford's identification, and Belford was responsible and accountable for its lawful operation on this trip, as much as if it had been loaded with Belford cargo. It is difficult to separate the control of the truck from the control of the driver. It cannot be doubted that Belford could have placed any reasonable restriction upon Huff while he was operating the truck, or could have made any reasonable requirement with respect to the manner of its operation. It could have discharged Huff while he was on the trip, and could have brought the truck to a stop until another driver was assigned.

> In determining the status of one as a loaned servant, in order to enable the original employer to escape liability, there are many conditions and factors that must be taken into consideration. A principal one appears to be that the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person.... "While it is true that one may be in the general service of another, and, nevertheless, with respect to particular work, may be the servant of another, who may become liable for his acts, yet to escape liability the original master must surrender full control of the servant in the performance of said work."

*Evans v. Farmers Mut. Hail Ins. Co.,* 240 Mo.App. 748, 217 S.W.2d 705, 709 (1949) (quoting *O'Brien v. Rindskopf,* 334 Mo. 1233, 70 S.W.2d 1085, 1088 (1934)).

Huff's employment in transporting the cargo of clay for Tharp was only a brief interval in his general employment as a Belford driver. This fact has been found to be of some significance when the court has been faced with the "borrowed servant" defense asserted by the general employer-borrowed, that is, by special employer (Tharp) from general employer (Belford). *Crain v. Webster Electric Cooperative,* 568 S.W.2d 781, 791 (Mo.App.1978).

The Commission also could have found from the evidence that Huff had not consented to leave the employment of Belford and become exclusively the employee of Tharp. To have given such consent, Huff would have given up the protection of the workers' compensation insurance carried by Belford. This is a factor which has

been considered by the courts on the issue of an employee's implied consent to be lent by one employer to another. *See Stroud v. Zuzich,* 271 S.W.2d 549, 556 (Mo.1954).

Under the evidence before the Commission, the Commission could find that Belford had not completely surrendered control of Huff for the purpose of hauling the cargo of clay from Georgia to Trenton, Missouri; that Huff had not consented to leave off his Belford employment and become Tharp's employee for that purpose; and that Huff was not Tharp's "borrowed servant" so as to remove him from Belford's employment for workers' compensation purposes.

■ We turn next to Belford's second argument, namely, that Florida's earlier denial of workers' compensation benefits to Huff against Belford, on the ground that Huff under the provisions of Florida's workers' compensation law was not Belford's employee at the time of his injury, was conclusive upon Huff under the Full Faith and Credit Clause and under principles of res judicata and collateral estoppel. This argument has been repeatedly decided adversely to Belford's position. Successive workers' compensation awards in different states, either allowing or denying workers' compensation benefits, are not forbidden by the Full Faith and Credit Clause nor by principles of res judicata or collateral estoppel. 4 Larson, Workmen's Compensation Law, §§ 85.20–85.50; 82 Am.Jur.2d, *Workmen's Compensation,* § 582 (1976); *Jimenez v. Ford Motor Co.,* 743 S.W.2d 120, 122 (Mo.App.1988); *Stoddard v. Wilson Freight, Inc.,* 651 S.W.2d 152, 155 (Mo.App.1983); *Loudenslager v. Gorum,* 355 Mo. 181, 195 S.W.2d 498, 501 (1946) (en banc), *cert. denied,* 331 U.S. 816, 67 S.Ct. 1301, 91 L.Ed. 1834 (1947); *Thomas v. Washington Gas Light Co.,* 448 U.S. 261, 283–84, 100 S.Ct. 2647, 2661–62, 65 L.Ed.2d 757 (1980).

Judgment affirmed.

All concur.