Leonard SHURVINGTON, Respondent,

v.

CAVENDER DRYWALL and Missouri Employers Mutual Insurance, Respondents;

Leslie E. Huff Drywall and Farmers Insurance Exchange, Appellants;

Second Injury Fund, Respondent.

No. WD 58344.

Missouri Court of Appeals, Western District.

Jan. 30, 2001.

Lance LeFevre, Kansas City, for Appellant.

Jeff Stigall, Kansas City, for Respondent.

HOLLIGER, Presiding Judge.

Les Huff Drywall ("Huff") appeals the decision of the Labor and Industrial Relations Commission ("Commission"), awarding workers' compensation benefits to claimant, Leonard Shurvington, for injuries sustained on December 11, 1998. In its sole point on appeal, Huff claims the award of the Commission is not supported by competent and substantial evidence. The issue is not whether Shurvington is entitled to benefits, but rather, whether he is a borrowed servant subject to payment by Huff. Huff argues that Shurvington was an employee of Joe Cavender Drywall ("Cavender") at the time of the accident. Because we find that Shurvington was a borrowed servant of Huff, we affirm the decision of the Commission.

## FACTUAL AND PROCEDURAL BACKGROUND

Leonard Shurvington was an employee of Joe Cavender Drywall for 13 years. Shurvington served as foreman, installing sheetrock on homes under construction. For some time prior to December 11, 1998, Joe Cavender had a working relationship with Les Huff of Les Huff Drywall, who also installed sheetrock in residences. The two periodically worked on jobs for each other, generally when one was not busy and the other needed help to complete a job. The employers would sometimes do the work personally; other times, the work would be done by their employees. In the latter case, the two agreed that each employer was responsible for paying his own employees for work done on behalf of the other, and they agreed that each would pay workers' compensation insurance on their own employees.

Approximately two weeks prior to December 11, 1998, under their mutual work relationship, Huff and one of his employees assisted on a Cavender job because Huff had no work at that time. On December 8, 1998, Cavender contacted Huff and advised that business was slow for him and that his employees could work for Huff for three days. Huff accepted the help. Cavender then advised Shurvington that work would be slow for three days, that Huff needed help, and that Shurvington could work for Huff. Huff was present during this conversation. Shurvington went right then with Huff to the Huff job site, and received from Huff approximately 30 minutes of detailed instruction regarding the work to be done. Cavender did not accompany Huff and Shurvington to the Huff job site. Following the instructions, Shurvington returned to the Cavender job to "finish out the day."

On December 9, 1998, Shurvington began working at the Huff jobsite. The job was to last three days. On December 11, he was injured when he fell from an open balcony while carrying a piece of sheetrock.

On January 6, 1999, Shurvington filed his claim for compensation with the Division of Workers' Compensation. A hearing took place on March 18, 1999, before an administrative law judge of the Division of Workers' Compensation. The only issue before the Division was the nature of the employer/employee relationship. On April 15, 1999, the ALJ issued a determination that Shurvington was entitled to benefits, that the award was to be paid by Huff, and that the claims against Cavender were dismissed. Its findings were as follows:

> Shurvington had worked for Cavender for 13 years, as a foreman of a crew installing drywall. On December 8, 1998, Cavender was installing drywall in a residence, with Shurvington as foreman, and the job was nearly complete.

> Cavender told Shurvington he would not have work for him for three or four days and when the job was done, he could go to work for Huff, who was installing drywall in a house a few miles away.

> Cavender did not order Shurvington to do so, but rather the choice lay with Shurvington as to whether he would work for Huff or wait until Cavender had work for him. He consented to work for Huff.

> Cavender did not go to or visit the Huff site with Shurvington. He did, however, tell Shurvington he could take two of Cavender's other employees with him.

> When Shurvington began work for Huff, he was told to start upstairs. Huff gave Shurvington about thirty minutes of instruction as to how he wanted the job completed. Shurvington and Huff discussed the starting time for work each day; they agreed upon the time Shurvington suggested.

> Payment terms were not discussed between Huff and Shurvington; in the past, Cavender paid Shurvington for

work done for Huff.[1]

When Shurvington began work the following day, he used his own screw gun, and a bench owned by Cavender. Huff furnished the remainder of the tools and job materials. Huff directed Shurvington throughout the day as to how he wanted things done.

The ALJ dismissed the claim against Cavender on a finding that Shurvington was a borrowed servant of Huff in that Cavender had completely surrendered control of Shurvington to Huff, and gave no instructions to him.

On April 29, 1999, Huff appealed the decision of the ALJ, challenging the sufficiency of the evidence to support the Division's ruling. Huff argued, *inter alia*, that Shurvington was a joint employee and not a borrowed servant, and that Huff and Cavender should be jointly liable for Shurvington's injuries. The Commission rejected that argument, finding that Shurvington was a borrowed servant of Huff and, therefore, Huff alone was liable for benefits payable to Shurvington. The Commission affirmed the decision of the ALJ on a finding that there was competent and substantial evidence supporting it.

Huff now appeals the decision of the Commission. He contends that the Commission erred in finding him solely liable for benefits payable to Shurvington. He claims the findings of the Commission were not supported by sufficient and competent evidence.

## STANDARD OF REVIEW

■ In a workers' compensation case, we review the Commission's decision to see if it is supported by competent and substantial evidence on the record as a whole. *Davis v. Research Med. Ctr.,* 903 S.W.2d 557, 571 (Mo.App.1995).

## DISCUSSION

The sole issue to be decided on appeal is whether Leonard Shurvington was an employee of Les Huff through application of the borrowed servant doctrine. Huff claims that the Commission erred in finding him solely liable for Shurvington's injuries, in that the finding is not supported by substantial evidence. Huff argues that Shurvington was the joint employee of both employers rather than a borrowed servant, and that since Cavender testified that he directed Shurvington and his crew to work on Huff's job site, and retained the right to withdraw them, Cavender cannot avoid liability by the ALJ's reliance upon Shurvington's testimony that he consented to the work. Huff asserts that Cavender retained control over whether or not his employees could work for Huff; and that, in determining the issue of control, the Commission should have found facts consistent with Cavender's testimony, rather than that of Shurvington.

■ It is well known that employers sometimes loan, borrow, or share workers with other employers. The lessor employer, the one loaning the employee to another employer, is known as the general employer. The lessee employer, the one borrowing the employee, is known as the special employer. If the employers are sharing workers, they may be joint employers. If they are joint employers, each is jointly and severally liable for workers' compensation benefits. *Stone on Behalf of Stone v. Heisten,* 777 S.W.2d 664, 667 (Mo.App.1989). If they are not joint employers, the loaned employee is a borrowed servant of the special employer. An employer is defined as "…[e]very person … using the service of another for pay." Section 287.030.1(1) RSMo 1998.

■ We initially consider whether Huff and Cavender were joint employers. Joint employment occurs when a single employee, under contract with two employ-

---

1. Though not a finding by the ALJ, Cavender testified that he owed Huff for work Huff and his employees had done for Cavender two weeks earlier.

ers, and under simultaneous control of both, performs services for both employers and the services provided are the same or closely related to that of the other. *Stone*, 777 S.W.2d at 667; *Patton v. Patton*, 308 S.W.2d 739, 748 (Mo.1958). At the time of his injury, Shurvington was performing services for Huff only, and not for Cavender. Though the employers were both in the drywall business, and therefore provided services closely related to that of the other, Shurvington was not under the simultaneous control of both because only Huff controlled the details of his work at that time.

■ Shurvington was not the joint employee of Huff and Cavender. We must next consider whether he was the borrowed servant of Huff.

■ We begin with the logical assumption that Cavender is Shurvington's general employer. Cavender loaned Shurvington to Huff for a three-day period during which Cavender had no work for Shurvington. When a general employer lends an employee to a special employer, employment by the general employer is presumed to continue and the general employer remains liable. *Schepp v. Mid City Trucking Co.*, 291 S.W.2d 633, 641 (Mo. App.1956); 3 Arthur Larson, *Larson's Workers' Compensation Law*, sec. 67.02 (2000). The special employer, then, becomes liable for workers compensation only if there is a clear showing that the employee is a borrowed servant of the special employer, by establishing the following elements:

1. The ***consent*** on the part of the employee to work for the special employer;

2. Actual ***entry*** by the employee upon the work of and for the special master pursuant to an express or implied contract to do so; and

3. Power of the special employer to ***control*** the details of the work to be performed and to determine how the

work shall be done and whether it shall stop or continue.

*Ellegood v. Brashear Freight Lines, Inc.*, 236 Mo.App. 971, 162 S.W.2d 628, 633 (1942) (emphasis added). In determining whether Shurvington was the borrowed servant of Huff, we consider whether these elements are met by the facts of the case.

### Control

■ We consider the issue of control first because, while it is not conclusive, it is of "greatest significance." *Schepp*, 291 S.W.2d at 640. It is important to note that the factor for consideration is the control of the special employer, not of the general employer. *Ellegood*, 162 S.W.2d at 633.

Huff challenges the Commission's reliance upon *Patton*, and *Reichert v. Jerry Reece, Inc.*, 504 S.W.2d 182, 186 (Mo.App. 1973), in holding that a borrowed servant relationship exists without the general employer relinquishing absolute and total control. Huff contends that there are two lines of authority. He claims that the most recent authority and the better rule is that, absent a showing of complete surrender of control over the employee, the general employer remains liable. This line of authority, he says, is represented by *Schepp*, *Stone*, and *Huff v. Belford Trucking*, 809 S.W.2d 71 (Mo.App.1991). He believes the Commission misstated the law in relying on what he claims is the other line of authority—that the borrowed servant defense may be available to the general employer even if some control is retained by the general employer. He argues that line of authority is represented by *Patton* and *Reichert*.

If Huff is correct that there are two inconsistent lines of authority, then we would be compelled to follow *Patton*, as the pronouncement of our Supreme Court, and reject the other line of authority. In *Patton*, the special employer (Tri–State) contended that there was error in awarding compensation benefits to Mr. Patton against it because "Patton and Boyd did not resign *full* control of Jess Patton for

the time being and Tri–State did not have sole and exclusive control over him, and, also, the employee did not consent to a change of employers." *Patton,* 308 S.W.2d at 744 (emphasis in original). We perceive that to be essentially the argument made now by Huff.

The *Patton* court then discussed a number of cases reciting the general principle in tort cases, that "[t]he *right* of control, rather than the *fact* of control, governs. To escape liability the original master *must resign full control* of the servant for the time being." *Id.* at 744 (internal citations omitted) (emphasis added). The court then extensively discussed *Schepp,* which was stressed by Tri–State as it is here by Huff. The court also cited a number of other cases sustaining awards against the general, or original, employer.

The *Patton* court held that those cases were not determinative:

> In other cases this fact issue has resulted in holding the borrowed servant with respect to the particular act was the servant of the special employer. Tri–State would apply the rule that the general employer must resign full control and the special employer must have sole and exclusive control too broadly.

*Id.* at 745. The court then quoted from *McFarland v. Dixie Machinery & Equip. Co.,* 348 Mo. 341, 153 S.W.2d 67, 71–72 (1941), which posited the issue as follows:

> The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed *in the business of and subject to the direction of* the temporary employer as to the details of such act. This is a question of fact in each case.

*Patton,* 308 S.W.2d at 746 (italics in *Patton* ). The *Patton* court then reminded that determining who is an employee and who is an employer under workers' compensation acts depends upon the terms and definitions of such acts and not on common law master/servant principles:

> The master's liability thereunder [workers' compensation acts] is not for a tort based on the rule of respondeat superior. The compensation law is broader than the common law principles of master and servant.

*Id.*

We do not read *Patton* as totally inconsistent with *Schepp,* except to the extent that *Schepp* might suggest that any retention of control by the general employer is incompatible with the borrowed servant doctrine. We do not so read *Schepp,* however, as discussed *infra.*

Likewise, we do not believe that the decision of this court in *Huff* represents a separate line of authority. There, we noted that the general employer (Belford), "although it did not exercise the right, did not surrender the right to control the details of Huff's work during this trip." *Huff,* 809 S.W.2d at 73. A close consideration of cases such as *Huff, Schepp, Reichert,* and *Patton,* illustrates the perils of attempting to apply broad general rules, such as suggested by the Appellant Huff here, to an infinite variety of circumstances and relationships created between and among general and special employers, particularly where leases of trucks and equipment are concerned. A close reading of the facts illustrates many differences, including the salary and payor, the provision of maintenance and payment of expenses, the name on trucks, and even differences as to whether the lessor or lessee is the general employer.

What does seem consistent, in our view, is a central requirement that each case be analyzed upon its facts regarding the issues of control and consent. Thus, in *Huff,* we think it significant that the general employer, Belford, had not relinquished the right to control the driver's means and method of doing his work and could have replaced him or removed him from that work and substituted another at any time. These factors are similar to those in *Schepp,* where the general employer with similar control remained liable.

And they are not inconsistent with those in *Patton,* where the special employer was held liable because he had the right to control when and where the driver stopped for the night (he was asphyxiated in a motel room). Nor do we find *Stone* inconsistent with those principles. The court in *Stone* found a "joint employment." We do not read *Stone* as requiring such a finding in every case where both the general and special employer have some control.

Most importantly, we do not find many of the trucking cases particularly helpful because, so often, they turn upon the particular lessor-lessee relationship between the parties. Those cases are only helpful to the extent that they state and discuss the basic principles of analysis and demonstrate the factual nature of the issue in each case.

Nor do we find *Wright v. Habco,* 419 S.W.2d 34 (Mo.1967), inconsistent with the principles discussed above, or for that matter particularly helpful. There, the general employer was a temporary help agency which provided employees to Habco. The employee there never performed any work for the general employer (the manpower agency). The sole reason for his employment was to work for the special employer and at the specific direction of the special employer.

The holding in *Huff* is that "[i]f the general employer retains some control over the employee *as he goes about the work for which he has been lent and borrowed,* the 'borrowed servant' defense to the workers' compensation claim is not available to the general employer." *Huff,* 809 S.W.2d at 73 (emphasis added). Appellant Huff in the present case misunderstands the very important distinction, however, between that case and this one. In *Huff,* the court found that the general employer continued to exercise some con-

trol over the employee: a) its name was positioned on the truck the employee was driving; b) it was responsible for the lawful operation of the truck and could have placed restrictions on the employee while he was operating it; and it could have discharged the employee while he was on the trip and halted the continuation of the trip until another driver could be found. Here, on the other hand, there was evidence that the general employer (Cavender) did not provide the tools by which Shurvington performed his work for Huff, nor could he have claimed or exercised the right to supervise Shurvington as he went about his work for Huff, nor could he have discharged Shurvington from the Huff job, though he could have discharged him from his own employ. Moreover, "[t]he principal question is not whether [Shurvington] remained the servant of [Cavender] as to matters generally, but whether, *when the accident occurred,* he was performing services essentially for [Les Huff] which [Les Huff] had the right to control or direct." *Reichert,* 504 S.W.2d at 186.

"If the general employer retains some control over the employee *as he goes about the work for which he has been lent and borrowed,* the 'borrowed servant' defense to the workers' compensation claim is not available to the general employer." *Huff,* 809 S.W.2d at 73 (emphasis added).[2] There was evidence that Cavender did not retain "some control" over Shurvington as he went about the work for which he was lent. "The core of the 'borrowed servant' defense is that the general employer has surrendered to the borrower *all* control over the employee, so that the employee has become, *with respect to the work for which he was loaned,* exclusively the employee of the special employer." *Id.* (emphasis added). The control at issue is the control over the

**2.** Cavender testified that he retained the right to retrieve Shurvington if he needed him, but that he would not do it. However, important to note is that the rule is as to "the work for which [the employee] was lent and bor-

rowed." *Huff,* 809 S.W.2d at 73. Cavender may have retained the right to control Shurvington as to general matters, but not as to the work he was doing for Huff.

employee's actions on the job at the time of the injury. *Reichert,* 504 S.W.2d at 186.

Again, there was evidence that Cavender indeed surrendered all control over Shurvington with respect to the work for which he was loaned. From the evidence in the record, we conclude that the Commission could have found that Cavender completely surrendered control of Shurvington for the purposes of the Huff drywall job and that Huff had complete control over the details of the work.

### Consent

For a worker to be a borrowed servant, he must himself have consented, expressly or impliedly, to leave the employ of the general employer and become, *for purposes of the work at hand,* the employee of the borrowing employer. *Erwin v. Polar* Express, 776 S.W.2d 458, 460–61 (Mo.App.1989) (emphasis added). Our review of the record reveals no express consent by Shurvington to leave the employ of Cavender, the general employer. If there was consent, then, it must be implied. *Id.* The employee's consent may be inferred from his acceptance of and obedience to orders given by the special employer. *Ellegood,* 162 S.W.2d at 633. Restated, the "consent of the employee may be implied from his action in proceeding with the employment, his general acceptance of it, and his obedience to orders." *Ballard v. Leonard Bros. Transp. Co., Inc.,* 506 S.W.2d 346, 351 (Mo.1974). We are aware of the holding of *Schepp,* that "the mere physical act of performing some service that is the 'work of and for' the special employer, pursuant to the command of the general employer does not alone justify the inference of 'consent,'" which "must be inferred solely from the fact that, in obedience to the orders of his general employer, claimant accepted and responded to [the special employer's] instructions, directions and rules; that he stated [the special employer] was his 'boss' for the day; and that he knew about the 'arrangements' and 'consented going' (because he had to—if he wanted to work)." *Schepp,* 291 S.W.2d at

642. (Internal citations omitted). We find *Schepp* factually distinct from the case at bar. There, (1) the general employer retained the right to discipline or discharge the employee, whereas the special employer had no such right; (2) the general employer ordered the employee to report to work for the special employer on penalty of not working if he did not report; and (3) the special employer had no say as to which employee reported to it for work. In the present case, on the other hand, Shurvington did not report to Huff by order of Cavender. He testified that he did not want to lose pay for three days, that his choices were to stay home and lose pay for the three days Cavender could not pay him, or to work for Huff for those three days for wages. He chose the latter. He accompanied Huff to the Huff jobsite, received detailed instructions as to how to complete the job, and he did not receive any instructions from Cavender about details of work to be done at the Huff job. By reporting to work at the Huff jobsite and proceeding with the work, he accepted and obeyed the orders given by Huff. Huff alone had the right to discipline or discharge Shurvington from the Huff jobsite. We conclude that the evidence was sufficient to support a finding by the Commission that Shurvington consented to work for Huff.

### Entry

We have discerned no dispute that Shurvington was actually engaged in the work of and for Huff at the time of his injury, thus satisfying the second element necessary to meet the borrowed servant test, that the job being accomplished was of interest only to the special employer. *Ellegood,* 162 S.W.2d at 633. If this element is met, the chances are good that the borrowed servant doctrine will be applied. *Larson,* sec. 67.04[1]. When he was injured, Shurvington was on the third day of the job, upon which he had actually entered the jobsite and had begun hanging sheetrock there. The evidence supports a

finding by the Commission that Shurvington had entered upon and was doing the work of and for Huff.

For the foregoing reasons, we affirm the decision of the Commission.

BRECKENRIDGE and SMART, JJ., concur.