Charles GATES, Sue Rickman, Eunice Gentry, Melba Edwards, Kenneth Gates, Brenda Wilson, and Walter Gates, Plaintiffs–Appellants,

v.

SELLS REST HOME, INC., d/b/a Sells Rest Home, Defendant–Respondent.

No. 23392.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 24, 2001.

Robert D. Huelskamp, Ste. Genevieve, MO, for Appellants.

Jeffrey S. Maguire, of Thomasson, Gilbert, Cook & Maguire, Cape Girardeau, MO, for Respondent.

JAMES K. PREWITT, Judge.

Charles Gates and his six brothers and sisters ("Appellants") appeal from a September 13, 1999 jury verdict in favor of Sells Rest Home, Inc. ("Respondent") on a wrongful death claim based on the disappearance from Respondent's facility and subsequent death of Appellants' father, Ernest Gates ("Decedent").

Decedent, a sharecropper, became a single parent in 1958 when his wife passed away. In 1968, Decedent had an accident that caused a severe head injury and prohibited him from working. Appellants noted in testimony that Decedent's overall demeanor and personality changed after the accident, that he became quieter, but Decedent continued to live by himself until sometime in the 1980s, when the family determined he needed additional care. A family doctor diagnosed Decedent as being in the early stages of Alzheimers disease and Decedent also experienced bouts of forgetfulness and decreased ability to taste and smell.

In 1992, through a court proceeding initiated by Appellants, Decedent was declared incompetent and two of the children were named guardians. Following that court determination, Appellants placed Decedent in the Minor Nursing Home, where he stayed for less than one year. At some point, Decedent walked away from the Minor Nursing Home and refused to return, and a Minor Nursing Home employee took Decedent to the home of one of his daughters and left him in the driveway; Decedent did not return to Minor Nursing Home.

On April 3, 1993, Appellants placed Decedent into Respondent Sells Rest Home. The admission records noted the above incident where Decedent had walked away from the Minor Nursing Home. Those admission records also showed previous diagnoses related to Alzheimers disease as well as senile dementia and infarct dementia.

On the date of admission, among the paperwork completed was a Facility Agreement. The agreement was signed by a Sells representative as well as Kenneth Gates, one of Decedent's children who served as a guardian at that time. The appropriateness of allowing admission of this agreement into evidence is one of the issues on appeal.

Between April of 1993 and July of 1997, Respondent's records show that Decedent wandered away from the Sells facility on nine occasions. While Respondent's facility had an Alzheimers wing, Decedent was never housed in that wing, no doctor ever ordered or recommended Decedent be moved to that wing, and the family never requested such measures be taken. Whether the Alzheimers unit is a locked unit that would prevent a resident from leaving or sound an alarm if an exit door were used is unclear from the testimony. The manager and operator of Respondent Sells Rest Home, John Sells, testified that "there is a door mechanism that makes it difficult for a confused resident to exit."

Within Decedent's patient records at Respondent's facility, there are various entries regarding his propensity to wander from or leave the premises. On most occasions, notations in the patient records indicated that Decedent would leave or attempt to walk away from the facility when he was angered or agitated. According to the testimony of both a nurse and an administrator at Respondent's facility,

it was not that Decedent would wander aimlessly as if he forgot where he was, rather he walked away purposefully—with the intention of leaving the grounds. When Decedent did leave the facility or announced his intention to do so, staff would try to talk him out of leaving or convince him to come back into the facility if he had left. It was not Respondent's policy to physically restrain a resident who attempted to leave or who had left the premises.

On July 26, 1997, Decedent was sitting on the front porch of the facility, a place where he spent much of his time. On this morning, a Sells employee noticed that Decedent was masturbating. Decedent was brought back inside and a nurse discussed with him that it was an activity only appropriate in the privacy of his room. His chart indicated that Decedent became "irate" and cursed, but did calm down and went to his room. This took place at 9:00 a.m.

The next time Decedent's actions were noted on that day was around 11:00 a.m. At 11:10 a.m., Decedent's chart states that he was "seen walking in hall, calm at present." According to the testimony of a nurse, she saw Decedent as she was walking to the staff breakroom to have lunch. The nurse further testified that she then walked somewhere close to the breakroom to get something to drink and noticed Decedent was gone. The next notation in the chart is at 11:15 a.m., which states that "staff [is] looking for resident for lunch."

Respondent's staff began looking for Decedent within the facility and on the grounds. By 12:11 p.m., law enforcement was called to aid in the search. Decedent's family was also called. Numerous law enforcement members and volunteers searched for Decedent. The search also included two helicopters, one equipped with infra-red capabilities. Unfortunately,

Decedent was not found in the search, but his remains were located almost three months later on October 30, 1997, in a cotton field near the Respondent's facility. An investigation took place to determine if foul play was involved, but the cause of death was deemed natural causes.

The Missouri Division of Aging also investigated the incident. An investigator came to the scene a few days after the disappearance to gather information from Respondent's staff and Decedent's family members. The investigator later filed a written report and testified that her report was part of a larger report filed by the Missouri Division of Aging on the incident.

At trial, when Respondent's attorney asked the investigator about the conclusions of the report, the other contested issue on appeal arose. After sustaining Appellants' objections on relevancy and foundational grounds, the trial court determined it would not allow into evidence the full Division of Aging report. However, the witness was allowed to respond to questions regarding her input and conclusions in the report. The investigator was asked by Respondent's attorney whether "the report came to a conclusion ... with respect to whether or not there had been a violation of the regulations or the law in connection with the complaint?" After objection, the question was rephrased to ask the witness whether the report made "a conclusion with respect to whether or not there was a violation of the regulations or the law in connection with the complaint?" The investigator, when allowed to answer after Appellants' objections were overruled, stated that "[t]he conclusion made by Jefferson City was that there was no violation of the regulations." As discussed more fully later in this opinion, Appellants argue it was inappropriate to allow the investigator to testify to these conclusions.

On February 23, 1998, Appellants filed a wrongful death suit against Respondent (with petition amended on September 2, 1999) alleging that Respondent was negligent in its "failure to adequately supervise the Decedent; failure to provide sufficient staff to monitor Decedent; failure to prevent Decedent from leaving the premises of [Respondent] when [Respondent] knew or should have known that Decedent would wander away from the facility." Following a jury trial on September 9–10, and 13, 1999, the jury returned a 9–3 verdict in favor of Respondent.

■ Appellants' first point on appeal involves the facility agreement. Appellants claim the court erred by allowing the agreement into evidence and by sending it into the jury deliberation room because it contained an invalid exculpatory clause that was irrelevant to the issues on trial and thereby created a confusion of issues that prejudiced Appellants.[1]

■ "Appellate courts give substantial deference to the decisions of trial courts as to the admissibility or exclusion of evidence, which will not be disturbed absent a showing of an abuse of discretion." *Murray v. Lamont,* 931 S.W.2d 899, 901 (Mo.App.1996). Abuse of discretion occurs only when a trial court's decision "is clearly against the logic of the circumstances ... and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberation." *Id.* Further, to be a ground for reversal or order of a new trial, the court's "error in admitting or excluding evidence must be prejudicial and not harmless." *Id.* Under Rule 84.13(b), the judgment may not be reversed or new trial ordered unless the appellate court finds that the trial court committed an error

"against the appellant 'materially affecting the merits of the action.' " *Id.*

■ To be admissible, evidence must be relevant. Evidence is considered relevant when "the facts tend to prove or disprove facts at issue or corroborate other relevant evidence." *Herrera v. DiMayuga,* 904 S.W.2d 490, 492 (Mo.App.1995). Determining relevancy is subjective and trial courts are "accorded considerable discretion" in their admissibility rulings. *Id.* at 492–93. In a jury trial, when evidence is admitted that should have been excluded, the appellate court is required to assume that the jury considered that evidence as it reached its verdict. *See Bertram v. Wunning,* 385 S.W.2d 803, 807 (Mo.App.1965).

At issue for the Appellants is the appropriateness of admitting into evidence the facility agreement which was signed by a Sells' representative and one of Decedent's children (who also was one of his court-appointed guardians at that time) on the day of Decedent's admission into Respondent facility. Appellants point to paragraph twelve of the one-page agreement that states: "[t]he management of this Facility has agreed to exercise such reasonable care toward the person as his or her known condition may require; however, this Facility is in no sense an insurer of his or her safety or welfare and assumes no liability as such [f]or leaving the premises without permission." It is clear that under Missouri law, paragraph twelve does not meet the requirements of an exculpatory clause.

■ Contracts that purport to "exonerate a party from acts of future negligence are not against public policy in Missouri and are thus binding and valid on the parties." *Hornbeck v. All American In-*

1. Neither at trial nor on appeal did Respondent contend that the noted clause was exculpatory or that the clause could serve as a defense to the negligence claim.

*door Sports, Inc.*, 898 S.W.2d 717, 721 (Mo.App.1995). However, such contracts "are strictly construed against the party claiming the benefit of the contract." *Id.* Further, to be exculpatory, "clear and explicit language . . . is required to absolve a person from such liability." *Id.* A valid exculpatory clause must express the intention of the parties "in unmistakable language." *Alack v. Vic Tanny Int'l of Missouri, Inc.*, 923 S.W.2d 330, 334 (Mo.banc 1996). Thus, the rule is clear "that a contract provision exempting one from liability for his negligence will never be implied but must be clearly and explicitly stated." *Poslosky v. Firestone Tire & Rubber Co.*, 349 S.W.2d 847, 850 (Mo.1961).

 Whether the contract or purported exculpatory clause is clear and explicit or ambiguous and nonexculpatory is a matter of law; a matter for the trial court to decide and not the jury. *See Alack*, 923 S.W.2d at 337. Here, the court definitively stated that the clause could not serve to exculpate Respondent. Upon Appellant's objection to the offering of the facility agreement into evidence, the trial judge stated, "I'm certainly not going to allow [Respondent] to use this as a defense in this case . . . and I'm not gonna allow [Respondent] to get up and say this is an absolute defense to this case." Thus, while allowing the whole agreement into evidence, the court did prohibit the use of the document, or any of its clauses, as a defense by Respondent to the negligence charge. However, this ruling on the appropriate use of the facility agreement came within a bench conference held outside the hearing of the jury. The jury never received instructions regarding any restrictions in its consideration of the document.

During direct examination by Respondent's attorney, the administrator of the facility was asked to read paragraph twelve. It was the only portion of the agreement that was read. Appellants restated their objection to the agreement as a whole and noted their objection to the reading of the particular provision. The court overruled the objection.

During deliberations, the facility agreement was one of the exhibits requested by the jury. Appellants again stated their relevancy-based objection to use of the facility agreement. All exhibits requested by the jury, including the facility agreement, were sent to the jury for its consideration. As noted previously, the jury received no instructions (either during trial, at the close of evidence, or as the document was sent into the jury room) to reiterate the court's ruling that the document/clause was not to be used as a defense to negligence.[2]

Two questions arise. First, assuming the jury should not have been allowed to consider the facility agreement (i.e., it should not have been admitted into evidence), have Appellants met their burden of showing that the admission of the evidence prejudiced the verdict of the jury? *See Alack*, 923 S.W.2d at 338. Second, did the agreement serve some other appropriate evidentiary purpose; did it pass the relevancy test for some issue at trial?

 Assuming the facility agreement was erroneously admitted into evidence, "if the admissibility of such evidence is questionable or the appellate court is not convinced that the admission of the evidence was prejudicial, the trial court will not be convicted of an abuse of discretion which mandates reversal." *Williams v. Bailey*, 759 S.W.2d 394, 397 (Mo.App.1988). Here,

**2.** We mention this only because it may be relevant in determining the prejudicial effect of the document discussed hereafter.

the admissibility of the facility agreement is not questionable. Although the trial court ruled that neither the agreement as a whole nor paragraph twelve on its own could be used as a defense to negligence, the jury was never informed of this restriction. The jury could have easily assumed that the document was relevant and could serve as a defense for Respondent, especially because of the reading of paragraph twelve.

Under *Bertram,* we must presume the jury took the facility agreement into consideration. *See Bertram,* 385 S.W.2d at 807. Not only was the particular paragraph read to the jury during trial, the document was requested during deliberations. Thus, the presumption that the document was used as the jury formed its verdict continues to have validity here.

■■■■■ "[I]f evidence is admissible on any issue, it is not to be excluded because it would be inadmissible on another issue in the case." *Pettet v. Bieterman,* 718 S.W.2d 188, 191 (Mo.App.1986). If evidence is deemed relevant and non-prejudicial, (therefore admissible), it is for the jury to determine the appropriate weight to assign to the evidence. *See Johnson v. Creative Restaurant Mgmt.,* 904 S.W.2d 455, 459 (Mo.App.1995).

The Respondent argues that the facility agreement could have been relevant to other facts and issues in the case and considered by the jury in terms of, for instance, written documentation of an established facility/resident relationship between the parties. However, that there was an established relationship between the parties with Decedent as a patient/resident in Respondent's facility, was never at issue. In fact in its answer to Appellants' wrongful death petition, Respondent admitted all allegations relating to the existence of a relationship between the parties. Respondent admitted that Decedent was a patient and resident of its facility and that

Decedent was in the "care, custody, and supervision of" Respondent on the day Decedent disappeared from the facility. Thus, the facility agreement and its provision were not relevant to show the existence of an established relationship between the parties. There was no issue in that regard; the existence of such a relationship was undisputed.

■■■ The court erred by allowing the facility agreement (or any of its provisions) into evidence. Even under the abuse of discretion standard, nothing in the agreement was relevant to issues on trial. It was prejudicial to Appellants for the trial court to allow the facility agreement into evidence, to allow Respondent to have one of its witnesses read paragraph twelve to the jury, and to allow the exhibit to go into the jury room during deliberations.

■■■ In their second point on appeal, Appellants claim that the trial court erred by allowing a witness, an employee of the Missouri Division of Aging, to testify to conclusions contained in a Division of Aging report. According to Appellants, the witness was not qualified as an expert to render her opinion in the case, the conclusions to which she was allowed to testify were not her own, and the conclusions were irrelevant and without proper foundation as they related to issues not on trial. Therefore, Appellants claim that portion of the witness' testimony served to confuse and/or inflame the jury, thereby prejudicing Appellants.

Although we reverse and remand based on the first point relied on, we discuss the merits of Appellants' second point since it is an issue likely to appear again on remand. Since the point also relates to an evidentiary ruling made by the trial court, it is also reviewed using the abuse of discretion standard. *See Murray,* 931 S.W.2d at 901. Janet Glass was an investigator from the Missouri Division of Aging sent to Respondent's facility to investigate

the disappearance of Decedent. After her investigation, she wrote a report based on her investigation, which became part of a larger report on the incident released by the Missouri Division of Aging.

At trial, Respondent attempted to have the complete report admitted into evidence, but the court sustained Appellants' objections and refused to allow the entire report to be admitted, finding it irrelevant and lacking in foundation. However, the investigator was allowed to answer Respondent's question as to whether the report contained a conclusion regarding any violation of regulations or the law. After further objections based on lack of foundation and relevancy, the investigator was allowed to answer and she noted that "[t]he conclusion made by Jefferson City was that there was no violation of the regulations."

 Ms. Glass' testimony would be limited to opinions that "are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." *Stucker v. Chitwood*, 841 S.W.2d 816, 818 (Mo.App.1992). A witness is to "state facts from which the jurors are to form their opinion." *Id.* Generally a witness may testify to conclusions, opinions, or inferences if he or she has personally observed the circumstances or events and "the inference is common and accords with ordinary experiences of everyday life." *Id.*

Ms. Glass only had personal knowledge as to the Respondent facility and the information she gathered from Respondent's staff, Decedent's family, and Respondent's records. She formulated that information into a written report. She was allowed to testify as to her interactions, conversations, etc., with Respondent's staff and Decedent's family.

The trial court then sustained an objection to the admission of the complete Division of Aging report. However, the witness was allowed to testify to a conclusion contained in the overall report that Respondent's facility did not violate any regulations. That conclusion, which Ms. Glass identified as a conclusion "made by Jefferson City" was beyond the scope to what she should have been allowed to testify. Thus, the court erred by allowing Ms. Glass to testify to the conclusions of the report.

 In order to remand for a new trial, Appellants must show that the trial court's error caused them to suffer prejudice or was more than harmless error. *See Herrera*, 904 S.W.2d at 495. Respondent argues that Appellants first raised the issue of Respondent's compliance with or violation of regulations, and used expert testimony to establish an industry standard of care. "A party who opens up a subject is held either to be estopped from objecting to its further development or to have waived his right to do so." *City of Joplin v. Flinn*, 914 S.W.2d 398, 400 (Mo. App.1996).

However, whether Respondent violated state regulations in its handling of Decedent's disappearance on July 26, 1997, and his subsequent death was not an issue in the case. Appellants' allegations in the wrongful death petition were based on negligence claims; none of which were based on violation of regulations. Respondent is correct that during direct testimony by Appellants' expert witness, she discussed regulations concerning care plans and her opinion regarding how well such regulations were followed and the noted care plans were implemented at Respondent facility. The regulations to which Appellants' expert referred were specific to whether Respondent appropriately developed and implemented care plans for Decedent while he was a patient at Respondent's facility. However, Appellants

presented no evidence on the issue of violation of regulations specifically related to the disappearance and subsequent death of Decedent. Ms. Glass' testimony as to the conclusion in the Division of Aging report would only be relevant to that issue. The Division of Aging report referred to regulations or laws violated with respect to the incident itself—Decedent's disappearance and subsequent death. Since the issue of violation of regulations with regard to the incident cited in the wrongful death petition was not raised by Appellants and was not pled by them as part of their case, allowing Ms. Glass to testify to the conclusions in the report was more than harmless error. Appellants did not open it up as an issue; thus, her testimony could not be seen as relevant to any issue to the case.

The judgment is reversed and the cause remanded to the trial court to proceed in a manner not inconsistent with this opinion.

GARRISON, P.J., and PARRISH, J., concur.