**Raul CABALLERO and K. Stacey Caballero, Plaintiffs–Appellants,**

v.

**Leland D. STAFFORD, Jr., Defendant,**

and

**New Prime, Inc., Defendant–Respondent.**

**No. 27272.**

Missouri Court of Appeals,
Southern District.

Aug. 23, 2006.

Motion for Rehearing or Transfer Denied
Sept. 15, 2006.

Application for Transfer Denied
Oct. 31, 2006.

Shannon A. Vahle, Hyde, Love & Overby, LLP, Springfield, for appellant.

Stuart H. King, McDonald Hosmer King & Royce, P.C., Springfield, for respondent.

PHILLIP R. GARRISON, Judge.

Raul Caballero ("Caballero"), and his wife, K. Stacey Caballero (collectively referred to as "Appellants"), appeal from the trial court's judgment granting summary judgment in favor of New Prime, Inc. ("Respondent") in their suit arising from a tractor/trailer accident, in which Caballero was injured. The accident involved a tractor, leased by Caballero to Respondent, and a trailer, owned by Respondent. At the time of the accident, Caballero was in the sleeper of the tractor which was being operated by Leland Stafford ("Stafford"). This appeal involves the effect of contractual language in agreements between Caballero and Respondent. Specifically, contrary to the trial court's ruling, Appellants allege that the contract language does not result in Respondent being relieved of liability as a matter of law. We agree and reverse and remand.

## FACTS

In 2002, Caballero and Respondent entered into a written Independent Contractor Operating Agreement ("ICOA") and a written Personnel Service Agreement ("PSA"). Pursuant to the ICOA, the parties established an independent contractor relationship, whereby Caballero would lease a 2003 Freightliner tractor (referred to in the contract as the "Equipment") to Respondent, in order to haul freight for Respondent's customers. Caballero could operate the Equipment himself, employ his own drivers, or lease drivers from Respondent pursuant to the terms of the PSA. Stafford was a driver "leased" by Respondent to Caballero.

Appellants allege that on January 17, 2003, a tractor-trailer unit driven by Stafford left the roadway and overturned on its side while Caballero was a passenger in the sleeping berth. On April 30, 2004, Appellants filed a four-count petition against Respondent and Stafford for injuries sustained by Caballero in the accident. In Count I, Appellants sought relief from Respondent under the doctrine of *respondeat superior* based upon the alleged negligence of Stafford in his operation of the truck. In Count II, K. Stacey Caballero alleged loss of consortium by reason of her husband's injuries. In Count III, Appellants sought relief from Respondent for its alleged negligent hiring and retaining of Stafford, and in Count IV, Appellants sought punitive damages.

Respondent filed a motion to dismiss, which was later amended, asserting that it was not liable for Caballero's injuries based on either of two grounds: (1) Stafford was the "borrowed servant" of Caballero, and (2) clauses in the contracts between the parties relieved Respondent from liability for Stafford's negligence. Respondent's amended motion to dismiss referenced both the ICOA and the PSA, and both were included with the motion as exhibits.

The terms and provisions of the ICOA provide in relevant part:

1. *LEASE.* You hereby lease to [Respondent] the Equipment from the date of this Agreement through December 31 of the same year. Thereafter, this Agreement shall continue from year to year unless otherwise terminated as provided herein. During the term of this Agreement, [Respondent] shall have exclusive possession, control and use of the Equipment and complete responsibility for the operation of the Equipment.... The parties agree that the intent of this Agreement is to establish an independent contractor relationship at all times.

. . . .

2. *SERVICE.* You agree to make the Equipment available to [Respondent], with qualified and [Respondent] Certified drivers, to pick up loads and transport them to destinations designated by various shippers. Provided, however, You may refuse to haul any load offered to You by [Respondent][.]

. . . .

10. *DRIVERS.* You shall (i) drive the Equipment Yourself, (ii) employ, on Your own behalf, drivers for the Equipment, or (iii) lease drivers for the Equipment.

. . . .

11. *INSURANCE*

(a) *Liability.* [Respondent] shall provide and maintain auto liability insurance for the protection of the public pursuant to FHWA Regulations under 49 USC 13906. Said liability insurance may not necessarily insure You against loss.

. . . .

(e) *Occupational Injuries.* You shall either (i) make an election to procure

Workers' Compensation insurance protection against injuries sustained while in pursuit of Your business, for Yourself and Your drivers, and thereafter provide and maintain at Your own expense such insurance; or (ii) provide and maintain at Your expense a suitable alternative insurance, such as occupational accident insurance, for Yourself and Your drivers, which insurance must be approved by [Respondent].

. . . .

12. *ACCIDENTS, CLAIMS, LOSSES AND EXPENSES.*

. . . .

(e) *HOLD HARMLESS AND INDEMNIFICATION.* YOU AGREE TO INDEMNIFY AND HOLD HARMLESS [RESPONDENT], ITS AFFILIATED COMPANIES AND THEIR RESPECTIVE OFFICERS, DIRECTOR, SHAREHOLDERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS, FROM AND AGAINST ANY AND ALL LIABILITIES AND EXPENSES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, CLAIMS, DAMAGES, JUDGEMENTS, AWARDS, SETTLEMENTS, INVESTIGATIONS, COSTS AND ATTORNEY'S FEES (COLLECTIVELY, "CLAIMS") WHICH ANY OF THEM MAY INCUR OR BECOME OBLIGATED TO PAY ARISING OUT OF YOUR ACTS OR OMISSION OR THOSE OF YOUR AGENTS AND EMPLOYEES (INCLUDING DRIVERS LEASED FROM [RESPONDENT]). YOU FURTHER AGREE TO HOLD [RESPONDENT] HARMLESS AND TO INDEMNIFY [RESPONDENT] AGAINST ALL CLAIMS BY YOU AND YOUR AGENTS AND EMPLOYEES.

The terms and provisions of the PSA provide in relevant part:

1. DRIVERS.

(a) Supplying Drivers. [Respondent] shall, upon the request of [Caballero], lease drivers to [Caballero] who are employees of [Respondent] ("Drivers") to operate motor vehicles transporting freight which are owned or leased by [Caballero]. (the "Equipment").

(b) Status of Drivers. Drivers shall at all times be deemed to be and shall be employed by [Respondent] only.

(c) Qualification of Drivers. All Drivers shall be duly licensed and legally qualified under all state and federal regulations to drive the Equipment in interstate or intra-state commerce.

(d) Employment of Drivers. [Respondent] shall have the sole authority to hire and fire the drivers. If [Caballero] becomes dissatisfied with the performance of a Driver, [Caballero] may request [Respondent] to substitute another driver in his place and [Respondent] shall endeavor to provide a substitute driver as soon as practical. Any expenses incurred in relieving a Driver and replacing him with another driver, including the transportation of both Drivers to and from Springfield, Missouri shall be borne solely by [Caballero].

2. COMPENSATION OF DRIVERS.

(a) Wages and Deductions. [Respondent] shall be solely responsible for the payment of the Driver's wages and shall have the responsibility of making all deductions from such wages as are required by law, and forwarding such deductions and reports of the same to the proper state and federal authority.

3. WORKERS['] COMPENSATION INSURANCE. [Respondent] shall provide workers['] compensation coverage on all Drivers as required by applicable law.

. . . .

5. [CABALLERO'S] RESPONSIBILITIES WITH RESPECT TO DRIVERS.

(a) Supervisor of Drivers. On those occasions when the equipment is being furnished to [Respondent] by [Caballero] to haul freight, [Respondent] shall dispatch the Drivers. In all other respects, however, during the term of this Agreement, [Caballero] shall be responsible for the supervision and conduct of the Drivers, including causing the Drivers to abide by all work and safety rules of the Department of Transportation and [Respondent].

(b) Regulatory Compliance. [Caballero] shall require the Drivers to keep and maintain proper daily logs, daily vehicle inspections, on-the-road inspections by law enforcement officers, trip reports and all other records and data necessary to comply with all applicable regulations of the Department of Transportation and such other state and federal agencies having authority over the operation of [Caballero's] equipment. . . .

6. HOLD HARMLESS AND INDEMNIFICATION.

(a) Damage to [Caballero] and Equipment. [Caballero] agrees not to hold [Respondent] or the Drivers responsible for any damage or injuries suffered by [Caballero] or to [Caballero's] Equipment as a result of any action by Drivers and hereby releases [Respondent] and the Drivers from any such claims.

(b) Other damage and Claims. Because [Caballero] is responsible for the supervision and conduct of the Drivers, [Caballero], notwithstanding the fact that the Drivers are the employees of [Respondent], shall pay to [Respondent] all amounts required by paragraph 12 contained in the separate Operating Agreement between the parties.

(c) Business Interruption. [Caballero] agrees not to hold [Respondent] responsible for any damage or loss of business suffered by [Caballero] caused by and [sic] interruption of services by the Drivers furnished to Lessee hereunder and hereby releases [Respondent] from any such claim.

On October 5, 2004, the court determined that Respondent's amended motion to dismiss would be treated as a motion for summary judgment, because it presented matters outside the pleadings. Before filing their response, Appellants were given time to depose two employees of Respondent: Darrell Hopkins ("Hopkins"), who is responsible for accounting and administrative functions; and Donald Lacy ("Lacy"), Respondent's director of safety.

Hopkins provided the following information in his deposition testimony: (1) Drivers such as Stafford were employed in order to further Respondent's business interests, and Stafford was employed by Respondent on the date of the alleged accident; (2) Respondent carries workers' compensation insurance for its employed drivers including Stafford; (3) at the time of the alleged accident, Stafford was operating the tractor-trailer unit under Respondent's Department of Transportation ("D.O.T.") authority; (4) although Respondent was reimbursed by Caballero for Stafford's driving services, Respondent signed Stafford's paychecks and was listed as Stafford's employer on his W–2 forms; (5) Respondent dispatched the freight hauled by Stafford, thus dictating when and where Stafford was to pick up, haul, load, and unload freight for Respondent or Respondent's customers; (6) Stafford could not haul freight for any other company while employed with Respondent; (7) any trailer pulled by Stafford was owned

by Respondent; (8) Stafford was required to perform pre-trip inspections of any tractor-trailer unit he was driving; (9) Stafford was also required to submit to drug testing and physical examinations; and (10) Respondent maintained the authority to suspend Stafford if it felt that he was not driving safely.

Lacy provided the following information in his deposition testimony: (1) Respondent is responsible for all of the drivers operating under its D.O.T. authority, and must ensure that its drivers comply with the Federal Motor Carrier Safety Regulations; (2) if Respondent believes a driver is unsafe, it maintains the authority to disqualify him or her; (3) Respondent dispatches the loads being hauled by Stafford, and controls when and where the load is to be picked up or delivered; (4) Respondent controls the length of the haul and all other haul requirements; (5) Stafford is required by Respondent to comply with its policies regarding the loading and unloading of freight; (6) Respondent requires all of its drivers to adhere to information contained in: a driver handbook, the Federal Motor Carrier Safety Regulations, a pocket guide regarding hazardous materials, and an emergency response guide, all of which are supplied by Respondent; and (7) even when Stafford is a second seat driver placed with Caballero, Respondent can take action with regard to Stafford if it feels Stafford is driving unsafely.

After Appellants filed their response to the amended motion to dismiss, and Respondent filed its reply, the trial court granted summary judgment in favor of Respondent on Counts I and II of Appellants' petition. In a memorandum explaining its decision, the trial court provided in relevant part:

The language included in the agreements is somewhat convoluted on the issue of which party has control of driver Stafford. The provisions are, no doubt, worded to include required DOT language, to avoid violation of DOT's restrictions regarding delegation of safety requirements, and to comply with DOT's prohibition of permitting multiple carriers to operate under a single carrier's authority. The language also attempts to pass control to [Caballero] owner operator.

On the "hold harmless" issue, the agreements are quite precise, but do not include the exact language [Appellants] urge the Court to require.

. . . .

Both parties refer to the Missouri Supreme Court case of *Alack v. Vic Tanny International of Missouri, Inc.,* 923 S.W.2d 330 (Mo. [banc] 1996).That case involved an agreement between a health club and it's [sic] injured member. The language in that agreement purports to release the club from liability for their own future negligence. The Court states:

"The words 'negligence' or 'fault' or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs. There must be no doubt that a reasonable person agreeing to an exculpatory clause understands what future claims he or she is waiving." *Id.* at 337-8. The Court also advised that less precise language may be effective in certain commercial situations. *Id.* at 338 [n. 4]. The case before this court is unlike *Alack.* Here, any liability [Respondent] may have in counts one and two is based entirely on the legal fiction of vicarious liability for [ ] Stafford's actions under the doctrine of *Respondeat Superior.* We have two entrepreneurs involved in a freight hauling venture enter into agreements, not to exculpate [Respondent] from their own negligence, but

rather to make clear as between them, which party will be responsible for a third party's negligence.

The contract between the parties on the "hold harmless" issue is precise, clear and unambiguous, and need not include the "magic" language suggested in *Alack*. The Court has not identified any statute, regulation or case law prohibiting parties from entering into agreements involved in this case. The plain language of the contracts should be enforced; therefore, [Respondent's] motion for summary judgment as to count one of [P]laintiffs' petition as well as [P]laintiff wife's derivative consortium claim in count two is sustained.

On August 19, 2005, the trial court executed a "Partial Summary Judgment" in which it explained that "Counts I and II of [Appellants'] petition fail to state a claim upon which relief can be granted against [Respondent] for the reasons set forth in the Court's prior Memorandum." On August 24, 2005, Appellants dismissed, without prejudice, Counts III and IV of their petition. This appeal follows.[1]

## OPINION

Appellants' two points on appeal are interrelated and will be discussed jointly. In essence, Appellants argue that the trial court erred in granting summary judgment in favor of Respondent because, contrary to the court's finding, the contractual clauses were exculpatory in nature but do not comply with the requirements of *Alack* with regard to such clauses.

We give no deference to the trial court's grant of summary judgment, as the propriety of summary judgment is strictly an issue of law. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). We use the same principles employed by the trial court in determining whether to grant summary judgment. *Id.* Furthermore, we view the record in the light most favorable to the non-movant. *Id.* All facts set forth by affidavit or otherwise in support of summary judgment are taken as true unless contradicted by the non-movant's response. *Id.*

A defending party is entitled to summary judgment if he can show:

(1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. Regardless of which of these three means is employed by the "defending party," each establishes a right to judgment as a matter of law. Where the facts underlying this right to judgment are beyond dispute, summary judgment is proper.

*Id.* at 381.

Once movant has met this burden, the non-moving party may only avoid summary judgment being entered against him/her if that party can "show-by affidavit, depositions, answers to interrogatories, or admissions on file-that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed." *Id.*

In its motion, Respondent relied on the following contentions: (1) it was not vicariously liable for the alleged negligence of

---

1. Stafford's motion to dismiss was denied, but the trial court entered an order in which it "expressly determine[d] that there [was] no just reason for delay."

Stafford because he was under the control of Caballero and was, therefore, his "borrowed servant"; and (2) the indemnity and hold harmless clauses in the contracts should be enforced because they are not "pure exculpatory clauses ... because the language does not shift fault of [Respondent] itself; rather it merely defines which of the contracting parties is responsible for the performance of [Stafford]." In responding to the motion, Appellants contended there were genuine issues of fact regarding whether Stafford was a "borrowed servant" of Caballero, and that the indemnity and hold harmless clauses of the contracts constituted exculpatory clauses that were impermissibly vague and ambiguous and therefore not effective, under this scenario.

## I. BORROWED SERVANT DEFENSE

 In the present case, Appellants allege that Respondent is vicariously liable for any injuries resulting from Stafford's negligence. Under the doctrine of *respondeat superior*, Respondent is vicariously liable for Stafford's negligence only if, at the time of the accident, Stafford was Respondent's employee and was engaged in an activity within the course and scope of his employment. *Burrell ex rel. Schatz v. O'Reilly Automotive, Inc.*, 175 S.W.3d 642, 647 (Mo.App. S.D.2005). However, "[t]he borrowed servant doctrine can block a general employer's vicarious liability for its employee's negligence." *Wren v. Vaca*, 922 S.W.2d 408, 410 (Mo.App. W.D.1996). Therefore, if Stafford was the "borrowed servant" of Caballero at the time of the accident, vicarious liability cannot be imposed on Respondent.

 "The core of the 'borrowed servant' defense is that the general employer [Respondent in this case] has surrendered to the borrower [Caballero in this case] all

control over the employee, so that the employee has become, with respect to the work for which he was loaned, exclusively the employee of the special employer or borrower." *Huff v. Belford Trucking Co.*, 809 S.W.2d 71, 73 (Mo.App. W.D.1991). The essential elements necessary to establish a "borrowed servant" relationship are as follows:

(a) consent on the part of the employee to work for the special employer; (b) actual entry by the employee upon the work of and for the special master pursuant to an express or implied contract so to do; and (c) power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.

*Ballard v. Leonard Bros. Transport Co., Inc.*, 506 S.W.2d 346, 350 (Mo.1974) (citations omitted).

 "To escape liability the general employer must surrender full control of the employee in the performance of the particular work, it not being sufficient if the servant is partially under the control of a third party." *Koirtyohann v. Washington Plumbing & Heating Co.*, 471 S.W.2d 217, 219–20 (Mo.1971). "If the general employer retains some control over the employee as he goes about the work for which he has been lent and borrowed, the 'borrowed servant' defense ... is not available to the general employer." *Huff*, 809 S.W.2d at 73. The mere fact that an employee obeys the orders of the temporary employer does not necessarily make that employee a "borrowed servant" of the temporary employer. *Brickner v.Normandy Osteopathic Hosp., Inc.*, 746 S.W.2d 108, 114 (Mo.App. E.D.1988). By the same token, "in the leasing of equipment and operators to another, the mere fact that the general employer continues to pay the operator's wages, the gas, oil and other

expense, and is responsible for maintenance, does *not* prevent the operator from becoming a [borrowed servant] of the lessee." *Ballard*, 506 S.W.2d at 351.

■ Respondent argues that "[t]he [PSA], pursuant to its own provisions and read in conjunction with the [ICOA], clearly and unambiguously provides that a driver supplied to Caballero at his request—such as [Stafford]—was the borrowed servant of Caballero." The ICOA provides that "[Respondent] shall have exclusive possession, control and use of the Equipment and complete responsibility for the operation of the Equipment." Pursuant to the ICOA, Caballero further agreed to make the equipment available to Respondent in order to transport freight for Respondent's customers. Respondent, therefore, has exclusive control over the leased equipment, and dictates where and how freight is to be delivered. The PSA provides that Caballero is responsible for the supervision and conduct of Stafford, but also provides that Stafford shall be deemed an employee of Respondent only. Respondent is responsible for dispatching Stafford, and instructs Caballero about the manner in which he is to supervise Stafford:

> [Caballero] shall require the Drivers to keep and maintain proper daily logs, daily vehicle inspections, on-the-road inspections by law enforcement officers, trip reports and all other records and data necessary to comply with all applicable regulations of the [D.O.T] and such other state and federal agencies having authority over the operation of [Caballero's] equipment.

In sum, Respondent instructs Caballero how he is to supervise Stafford while Stafford is driving equipment under the complete control of Respondent. The deposition testimony of Hopkins and Lacy provides that Respondent controlled where and when the load was to be picked up and delivered, and determined the requirements for each haul. We fail to understand how Respondent can have complete control over the equipment operated by Stafford, and dictate the manner in which Caballero is to supervise Stafford, but at the same time have relinquished total control over Stafford to Caballero.

In arguing that Stafford is the "borrowed servant" of Caballero, Respondent relies heavily on the western district case, *Wren*. However, that case is distinguishable. In *Wren*, American Driver Leasing, Inc. ("ADL") leased truck-driver Robert Vaca ("Vaca") to Mo–Kan Express ("Mo-Kan"). 922 S.W.2d at 409. Vaca fell asleep while driving a tractor-trailer unit for Mo-Kan resulting in an accident. *Id.* Jack Wren ("Wren"), an employee of Mo-Kan, who was in the tractor's sleeping compartment, was injured as a result of the accident. *Id.* Wren sued both Vaca and ADL. *Id.* ADL claimed it was not liable for Vaca's negligence because Vaca was the "borrowed servant" of Mo–Kan. *Id.* at 410. The following facts were undisputed in that case:

> Vaca received his pay from ADL which had leased Vaca to Mo–Kan.... Mo-Kan controlled Vaca's day-to-day duties. Through Wren, it told Vaca when to report for work and where to go and how to perform his duties. ADL paid for Vaca's health insurance, but Mo–Kan reimbursed it for this expense. ADL reserved the right to fire Vaca. It also exercised some control over its drivers by requiring them to obey its company policies and rules. It had a right to withhold payment from drivers who did not obey its policies and rules. ADL paid workers' compensation benefits for Vaca.

*Id.* at 409–10. In determining that Vaca was the "borrowed servant" of Mo–Kan, the court explained, "ADL established that Mo–Kan controlled the details of Vaca's work. It told him when to drive, where to drive, how to drive, and how to load and unload his cargo. This was sufficient to relieve ADL of liability for Vaca's negligent operation of the tractor-trailer rig." *Id.* at 410. The court further noted that "ADL's requiring Vaca to obey its general policies and rules had no relevance to the particular work demanded by Mo–Kan. . . . Vaca did not drive unless Mo–Kan told him to drive. ADL had no right to assert control over when Vaca drove, where he drove, or how he drove." *Id* at 410–11.

Respondent argues "[a]s in *Wren,* the issue before this Court is not whether [Respondent] was [Stafford's] employer— [Respondent] acknowledges that it was. Rather, the issue is who controlled the details of [Stafford's] work in connection with the operation of Caballero's truck[.]" Respondent alleges that the parties "resolved this controlling issue on December 10, 2002[,] when they contractually agreed that Caballero 'shall be responsible for the supervision and conduct of the Drivers.'" We disagree.

In *Wren,* the "borrowed servant" was leased to another trucking company; therefore the leasing employer had absolutely no control over when Vaca was to report for work, where he was to go and how he was to perform his duties. 922 S.W.2d at 410–11. In the present case, Stafford was not leased to another trucking company but to Respondent's own independent contractor. This is an important distinction, because while Caballero agreed to supervise Stafford, Stafford was at all times performing work at the direction of Respondent. As such, Respondent told Stafford, whether through Caballero or directly, when to report for work, where to haul freight, and how to perform his duties.

The trial court found that "[t]he language included in the agreements is somewhat convoluted on the issue of which party has control of driver Stafford." We agree with the trial court's apparent conclusion that there remain material facts in dispute regarding the existence of the "borrowed servant" relationship. Certainly, the record does not permit us to conclude that Respondent was entitled to a judgment as a matter of law on that theory.

The PSA specifically provides that Stafford "shall at all times be deemed to be and shall be employed by [Respondent] only." Since summary judgment would not have been appropriate on the issue of "borrowed servant," Respondent would be entitled to summary judgment only if the indemnity and hold harmless provisions contained in the ICOA and PSA, purporting to release Respondent from liability for the actions of Stafford, are valid and enforceable. The issue, therefore, is whether the contract language is effective to relieve Respondent of vicarious liability as a matter of law.

## II. ENFORCEABILITY OF INDEMNITY AND HOLD HARMLESS PROVISIONS

The relevant contractual provisions in the ICOA and PSA are labeled "Hold Harmless and Indemnification," but the parties are in disagreement regarding whether they are indemnity clauses, exculpatory clauses, or both. In its amended motion to dismiss, Respondent asserts that the contractual provisions "are not pure exculpatory clauses ... because the language does not shift fault of [Respondent] itself; rather, it merely defines which of the contracting parties is responsible for the performance of the 'leased' driver."

Similarly, the trial court found that the agreements do not "exculpate [Respondent] from their own negligence, but rather . . . make clear as between [Respondent and Caballero], which party will be responsible for a third party's negligence."

An "exculpatory clause" is "[a] contractual provision relieving a party from liability resulting from a negligent or wrongful act." Black's Law Dictionary 608 (8th ed.2004). An "indemnity clause" is "[a] contractual provision in which one party agrees to answer for any specified or unspecified liability or harm that the other party might incur.—Also termed *hold-harmless clause; save-harmless clause.*" *Id.* at 784. The Supreme Court of Missouri in *Alack,* 923 S.W.2d at 334, cites the Supreme Court of Texas case *Dresser Industries, Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 508–09 (Tex.1993), in its analysis of the requirements necessary to release a party to a contract from its own negligence. In *Dresser,* the Supreme Court of Texas explains:

> [A] release surrenders legal rights or obligations between the parties to an agreement. It operates to extinguish the claim or cause of action as effectively as would a prior judgment between the parties and is an absolute bar to any right of action on the released matter. For these reasons, a release is expressly designated as an affirmative defense. . . . An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing and/or future loss liability. The agreement creates a potential cause of action in the indemnitee against the indemnitor.

853 S.W.2d at 508 (citations omitted).

An exculpatory clause or release operates in a procedurally different manner than an indemnity or hold harmless provision. If a motorist, not party to the contracts, was injured in this accident due to the negligence of either Stafford or Caballero, and the motorist recovered damages from Respondent, then pursuant to the contracts, Respondent could bring an indemnity action against Caballero. On the other hand, while labeled "Hold Harmless and Indemnification," the relative provisions in this case are being used by Respondent as an affirmative defense, which, if enforceable, would release Respondent from liability for Stafford's negligence.

As previously set out, the trial court characterized the relative agreements as follows: "We have two entrepreneurs involved in a freight hauling venture enter into agreements, not to exculpate [Respondent] from their own negligence, but rather to make clear as between them, which party will be responsible for a third party's negligence." With that characterization in mind the trial court related that "[t]he contract between the parties on the 'hold harmless' issue is precise, clear and unambiguous, and need not include the 'magic' language suggested in *Alack.*"

We disagree with the trial court's analysis. As set out above, in the absence of a "borrowed servant" relationship, Respondent is responsible for the negligent acts of its employees under the doctrine of *respondeat superior.* "[R]espondeat superior imposes vicarious liability on employers for the negligent acts or omissions of employees or agents as long as the acts or omissions are committed within the scope of the employment or agency." *Lindquist v. Scott Radiological Group, Inc.,* 168 S.W.3d 635, 655–56 (Mo.App. E.D.2005) (emphasis supplied). The parties do not dispute that Stafford is the employee of Respondent, and the PSA specifically provides that Stafford "shall at all times be deemed to be and shall be employed by [Respondent] only." Through the doctrine

of *respondeat superior*, Stafford's negligence would be imputed to Respondent. Since the contractual clauses here are being sought to relieve Respondent from liability for its employee's negligence, they are exculpatory in nature. *See O'Connell v. Walt Disney World Co.*, 413 So.2d 444, 446 (Fla.Dist.Ct.App.1982) (explaining that an indemnification clause which attempts to shift the responsibility for the payment of damages back to the injured party produces the same result as an exculpatory provision).

▉▉▉ "Although exculpatory clauses in contracts releasing an individual from his or her own future negligence are disfavored, they are not prohibited as against public policy." *Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.*, 168 S.W.3d 488, 497 (Mo.App. E.D.2005). Exculpatory clauses are strictly construed against the party seeking their enforcement. *Gates v. Sells Rest Home, Inc.*, 57 S.W.3d 391, 397 (Mo.App. S.D.2001). "[T]he rule is clear 'that a contract provision exempting one from liability for his negligence will never be implied but must be clearly and explicitly stated.'" *Id.* (quoting *Poslosky v. Firestone Tire & Rubber Co.*, 349 S.W.2d 847, 850 (Mo. 1961)). "Whether the contract or purported exculpatory clause is clear and explicit or ambiguous and nonexculpatory is a matter of law[.]" *Id.*

▉▉▉ In *Alack*, 923 S.W.2d at 337–38, the Supreme Court of Missouri set out a brightline test for courts to apply when assessing whether an exculpatory clause releases a party from its own negligence. "[E]xculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence.... General language will not suffice." *Id.* at 337.

The Court determined that an exculpatory clause purporting to shield a health club facility from liability for "any damages," "any injuries," and "any and all claims" arising from a member's use of its facilities was ambiguous. *Id.* "As extensive as it is, the exculpatory clause at issue in this case is ambiguous because it did not specifically state that a member was releasing Vic Tanny for its own future negligence." *Id.* The Court noted that "one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest," therefore "[a] contract that purports to relieve a party from any and all claims but does not actually do so is duplicitous, indistinct and uncertain." *Id.* The Court then related that:

> The better rule is one that establishes a bright-line test, easy for courts to apply, and certain to alert all involved that the future 'negligence' or 'fault' of a party is being released. The words 'negligence' or 'fault' or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs. There must be no doubt that a reasonable person agreeing to an exculpatory clause actually understands what future claims he or she is waiving.

*Id.* Similarly, "[a] contract of indemnity will not be construed so as to indemnify one against loss or damage resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms." *Nusbaum v. City of Kansas City*, 100 S.W.3d 101, 105 (Mo. banc 2003).

We disagree with the trial court and believe *Alack* is applicable to the case at bar. Where a party, such as Respondent, wishes to release itself from vicarious liability for the negligent acts of its employees, it must follow the rule of *Alack*.[2] The

---

**2.** We do not ignore the principal that less precise language may be effective in agree-

language in the PSA provides that Caballero agrees not to hold Respondent or Stafford "responsible for any damage or injuries suffered by [Caballero] ... as a result of *any action* by [Stafford] and hereby releases [Respondent] and [Stafford] from any such claims." Likewise, the language contained within the ICOA indicates that Caballero will indemnify and hold Respondent harmless from "liabilities," "expenses," "claims, damages, judgments, awards, settlements, investigations, cost and attorneys' fees." The relative provisions do not use the words "negligence" or "fault" or their equivalents, therefore such provisions do not relieve Respondent from liability for Stafford's negligence.

In holding that Respondent has not contractually released itself from liability for Stafford's negligence, we do not ignore the Supreme Court of the United State's holding in *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975). In that case, the Court held that "the presence in an equipment lease of an indemnification clause directed to the lessor's negligence is not in conflict with the safety concerns of the Commission or with the regulations it has promulgated." *Id.* at 41, 96 S.Ct. 229. The Court noted that "[a]lthough one party is required by law to have control and responsibility for conditions of the vehicle, and to bear the consequences of any negligence, the party responsible in law to the injured or damaged person may seek indemnity from the party responsible in fact." *Id.* at 40, 96 S.Ct. 229. In the present case, through the doctrine of *respondeat superior,* Respondent is the party responsible in fact, and is

therefore seeking to release itself from its own negligence. As previously set out, in Missouri, if a party wishes to release itself from its own negligence, "[t]he words 'negligence' or 'fault' or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs." *Alack*, 923 S.W.2d at 337.

The trial court erred in granting partial summary judgment in favor of Respondent. The relevant contractual provisions do not include the words "negligence" or "fault" or their equivalents as required by *Alack,* and therefore, are not effective to release Respondent from liability for the alleged negligence of Stafford. Furthermore, Respondent has not demonstrated that it was entitled to judgment as a matter of law, because there are genuine issues of material fact regarding Respondent's "borrowed servant" defense. Accordingly, the summary judgment entered by the trial court must be, and is hereby, reversed and the case remanded for further proceedings.

BATES, C.J., and SHRUM, P.J.,— concur.

---

ments negotiated at arms length between equally sophisticated commercial entities. *See Alack,* 923 S.W.2d at 338 n. 4; *see also Purcell Tire & Rubber Co., Inc. v. Executive Beechcraft, Inc.,* 59 S.W.3d 505, 510–11 (Mo.

banc 2001). However, we can find nothing in the record supporting the proposition that Caballero is a sophisticated commercial entity.